552 F.2d 948
 14 Fair Empl.Prac.Cas. 897,
13 Empl. Prac. Dec. P 11,584
Dr. Ina BRADEN on behalf of herself and all others similarly situated
v.
The UNIVERSITY OF PITTSBURGH and Wesley W. Posvar, Appellants.
 No. 75-1657.
 United States Court of Appeals,
Third Circuit.
 Submitted Dec. 10, 1975, Under Rule 12(b).
Argued Before the Court En Banc May 14, 1976.
Reargued Before the Court En Banc Nov. 4, 1976.
Decided March 11, 1977.
 
 Donald L. Very, Charles C. Arensberg, James M. Arensberg, Tucker, Arensberg & Ferguson, Pittsburgh, Pa., for appellants.
 Sylvia Roberts, Baton Rouge, La., David Berger, Michael K. Simon, Philadelphia, Pa., Harold Gondelman, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for appellees.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 This appeal raises two perplexing problems, one procedural and one jurisdictional. First, we are required to consider whether a district judge may vacate and reenter a certification order so as to allow an interlocutory appeal, when the appellants initially failed to proceed in a timely manner because they lacked notice of the original certification order.[1] If that question is answered affirmatively, we then must determine whether the trial court erred when it declined to dismiss the complaint on the ground that "state action," the essential predicate for jurisdiction under § 1983 of the Civil Rights Act,[2] was absent.
 
 
 2
 I. POWER OF A DISTRICT COURT TO VACATE AND REENTER A
 
 
 3
 CERTIFICATION ORDER SO AS TO ALLOW AN INTERLOCUTORY APPEAL.
 
 A.
 
 4
 This employment discrimination suit was instituted by Dr. Ina Braden, on behalf of herself and other women similarly situated, against the University of Pittsburgh ("University" or "Pitt") and against Dr. Wesley W. Posvar, the Chancellor of the University.[3]
 
 
 5
 The district court, however, dismissed the complaint. It did so, with respect to the § 1983 claim, on the ground that the relationship between the Commonwealth and the University was not such as to render the alleged discrimination "state action."[4] On initial appeal to this Court, the dismissal was vacated and the case remanded for further consideration of the § 1983 issue more particularly, the state action question.[5]
 
 
 6
 After extensive discovery had been concluded in the district court, and an evidentiary hearing held solely on the issue of state action, at the directive of this Court, the trial judge denied the defendants' renewed motions to dismiss the § 1983 claim for lack of jurisdiction. Rather, the district court indicated that state action might well exist.[6] It proceeded, pursuant to 28 U.S.C. § 1292(b), to certify the order denying the motion to dismiss.[7]
 
 
 7
 A panel of this Court then granted the defendants permission to appeal under Appellate Rule 5,[8] and referred the interlocutory appeal to a second panel for disposition on the merits. At that point, Dr. Braden challenged our jurisdiction, alleging that the defendants had not filed their application for an appeal within ten days of the district court certification, as prescribed by Rule 5. Since resolution of that issue required reexamination of a decision of a prior panel, we elected to consider the question en banc.
 
 
 8
 The problem confronting us here stems from the failure of the district court to give the defendants notice of its certification order, as provided by Fed.R.Civ.P. 77(d).[9] It was only after expiration of the ten-day filing period that the defendants learned of the entry of the order. Immediately thereafter, the defendants moved this Court for permission to appeal out of time, simultaneously obtaining a similar extension from the district court. Although the defendants were informed that this Court lacked authority to extend the time to appeal by virtue of Appellate Rule 26(b),[10] we suggested that they request the district judge to vacate his earlier certification order and to enter another. Upon submission of such a request, the district court vacated its original order and entered a new one containing the requisite § 1292(b) certification. Defendants thereupon filed their petition for permission to appeal within the time specified in Rule 5, and the new petition was granted.
 
 B.
 
 9
 Dr. Braden now maintains that we lack authority to permit the present interlocutory appeal. She claims that the district court's reentry of the certificate was ineffective to cure the defendants' failure to pursue their appeal within ten days of the original order.
 
 
 10
 It is well-settled that the neglect of a party to petition for leave to appeal within ten days of the entry of the certification order deprives an appellate court of jurisdiction to consider the petition,[11] and that Rule 26(b) forbids appellate courts to enlarge the time for filing such a petition. Nevertheless, the present appeal poses a different and more difficult question namely, whether a trial judge may vacate and reenter his own certification order so as to start the ten-day period running again. When, as here, a party has received no notice of the certification order and, therefore, has been prevented from asserting its right to appeal by an error of the trial court, the ability of such court to correct its own mistake might seem manifest. Yet, on cursory examination, there would appear to be no remedy available to an innocent party who fails to receive the requisite notice.
 
 Fed.R.Civ.P. 77(d) expressly provides:
 
 11
 Lack of notice of the entry by the clerk does not affect the time to appeal or relieve or authorize the court to relieve a party for failure to appeal within the time allowed, except as permitted in Rule 4(a) of the Federal Rules of Appellate Procedure.
 
 
 12
 Rule 4(a), which allows a district court to extend the time to appeal for thirty days upon a showing of "excusable neglect," applies at least on its face only to appeals as of right. By contrast, Rule 5 which deals with permissive appeals contains no comparable provision. Nor are permissive appeals referred to in Rule 77(d). If Rule 77(d) had specified that Rule 4(a) were the sole vehicle by which a district court may provide relief from lack of notice,[12] it might well follow that a § 1292(b) petitioner would have no remedy for failure to receive notice.[13] The proviso of Rule 77(d), applicable only to appeals as of right, contains no authorization for relief in permissive appeals, such as the one at hand.
 
 
 13
 The question thus arises whether a district court may accomplish indirectly what it may not do directly. At least one court of appeals has sanctioned such a procedure. In In re La Providencia Development Corp., the First Circuit upheld a district court which had vacated and reentered its certificate " 'in order that the parties not be deprived of a timely appellate decision.' "[14]
 
 
 14
 On the other hand, two courts appear to have indicated that vacation and recertification are tantamount to enlarging the time for appeal, and that such a maneuver is proscribed by Rule 77(d). In Woods v. Baltimore & Ohio Railroad,[15] the appealing party neglected to file a timely petition, even though he apparently had received adequate notice. After the district court had vacated and reentered its certification order, the appellate court held that such action could not confer jurisdiction over the interlocutory appeal because a district court has no power to extend the time for appeal, either directly or indirectly.
 
 
 15
 The reasoning of the Woods court was embraced in Nakhleh v. Chemical Construction Corp.[16] There the appellant was not aware that an interlocutory order had been entered, because the order had been listed under the wrong initial letter in the local law journal. The district judge stated that, while he could vacate his order should new facts or new decisional law necessitate reconsideration,[17] he could not vacate and refile a certification order merely to extend the time for appeal. It should be noted, however, that no attempt was made by the Nakhleh court to distinguish between the plight of the hapless party who, through inadvertence, received no notice, and that of the neglectful party, such as the party in Woods, who simply is remiss in pursuing his appeal. Nakhleh thus did not explore the outer limits of the rules which do not literally authorize extension of the time for appeal in the latter context, nor did it even purport to consider whether a remedy may be found in the former situation.
 
 
 16
 In addition to Woods and Nakhleh, Dr. Braden refers to this Court's decision in Milbert v. Bison Laboratories, Inc.,[18] to support the proposition that a district court has no authority to vacate and reenter a certification order. Yet, any attempted reliance on Milbert would appear to be misplaced. That case concerned the timeliness of the grant by a court of appeals of permission to appeal from an interlocutory order, the petition for leave to appeal having been filed within the prescribed time period. Moreover, whatever applicability Milbert might once have had to the present situation has been subverted by the subsequent amendment of Rule 5, a change which now expressly allows a grant of permission to appeal by a court of appeals "at any time" after entry of the interlocutory order.[19]
 
 
 17
 In short, in support of her thesis, Dr. Braden proffers only two cases which even deal with the problem of reentry of a § 1292(b) certificate by a district court Woods and Nakhleh. Nonetheless, we believe that both of these cases are distinguishable from that at hand. This is so because neither Woods nor Nakhleh concerned a situation in which an appealing party, solely because of dereliction on the part of a court officer, failed to receive the requisite notice of a certification order that had been entered by the Court.
 
 C.
 
 18
 It may be contended, on behalf of the position advanced by Dr. Braden, that the restricted time authorized for launching an interlocutory appeal reflects an interest in the speedy determination of such appeals. After all, the district court grants certification because it believes an immediate appeal "may materially advance the ultimate termination of the litigation."[20] To extend the ten-day period by vacation and reentry, goes the reasoning, would defeat the interest in an expedited review of the interlocutory order.
 
 
 19
 Understandable as this argument may seem, it is substantially undercut by the provision in Rule 5 which permits an application for certification at any time before final judgment. This proviso allows an extended period of time between the entry of an interlocutory order and an appeal therefrom so that considerable delay in prosecuting an appeal under § 1292(b) is, quite evidently, countenanced by the rule. In addition, when petitioned to vacate and reenter its certification, a district judge may determine anew whether such action will bring the litigation closer to an end. If there already has been excessive delay, the trial court can guard against additional delinquency by refusing to vacate and reenter its original certification order.[21]
 
 D.
 
 20
 Aside from these considerations, we believe that the evolution of Rules 77(d) and 4(a) lends support to the proposition that a district court is not foreclosed from vacating and reentering its own order at least when the court has neglected to provide a litigant with notice of its actions.
 
 
 21
 The Supreme Court precipitated several amendments to these rules when it decided Hill v. Hawes.[22] In Hill, the district court clerk failed to send notice of a final judgment to the parties, and so the time for appeal expired. Thereafter, the district judge vacated the judgment and entered a second judgment from which an appeal was taken in a timely manner. Treating the later judgment as ineffective, the appellate court dismissed the appeal on the ground it was a nullity. But the Supreme Court reversed, declaring that litigants were entitled to rely on Rule 77(d), which specifies that notice be sent to the parties. The Court posited:
 
 
 22
 It may well be that the effect to be given to the rule (77(d)) is that, although the judgment is final for other purposes, it does not become final for the purpose of starting the running of the period for appeal until notice is sent in accordance with the rule.[23]
 
 
 23
 Because Hill allowed a judgment to be vacated, despite the passage of a protracted period of time, Rule 77(d) subsequently was amended to counteract the impact of that decision on the finality of judgments.[24] The revised Rule 77(d) then provided that lack of notice of an order of judgment "does not affect the time to appeal or relieve or authorize the court to relieve a party for failure to appeal within the time allowed, except as permitted in Rule 73(a)." However, the Advisory Committee believed that the benefits of Hill would be preserved. The Committee asserted:
 
 
 24
 (I)n considering an application for extension of time for appeal as provided in Rule 73(a), the court may take into account, as one of the factors affecting its decision, whether the clerk failed to give notice as provided in Rule 77(d) or the party failed to receive the clerk's notice. It need not, however, extend the time for appeal merely because the clerk's notice was not sent or received.[25]
 
 
 25
 Rule 73(a), whose substance later was incorporated into Appellate Rule 4(a), was amended concurrently with Rule 77(d) to "(allow) the sort of relief that was brought about in Hill v. Hawes, but (to avoid) the difficulty of indefinite lack of finality of the judgment. . . ."[26] Rule 73(a) applied to all appeals "permitted by law" and specified that:
 
 
 26
 (U)pon a showing of excusable neglect based on a failure of a party to learn of the entry of the judgment the district court in any action may extend the time for appeal not exceeding 30 days from the expiration of the original time herein prescribed.
 
 
 27
 Thus, as the arrangement originally was designed, Rule 77(d) would preserve the finality of judgments, while Rule 73(a) would protect the right to appeal by those who inadvertently were not notified of the entry of a final judgment.
 
 
 28
 Subsequent to passage of the Interlocutory Appeals Act in 1958, one leading commentator expressed the view that the language of Rule 73(a) was sufficiently flexible to encompass interlocutory appeals.[27] Nonetheless, Rule 73(a) was amended in 1966 to deal specifically with appeals under § 1292(b), one of the sections governing non-final judgments. But Rule 73(a) still retained the broad language allowing a thirty-day extension for appeals "in any action."
 
 
 29
 When the substance of Rule 73(a) was subsumed in Appellate Rule 4(a), and thereby necessarily limited to appeals as of right, Rule 77(d) also was modified to refer to Rule 4(a). The elimination of a remedy for excusable neglect in taking an interlocutory appeal seemingly was the result of an oversight. It follows that Rule 77(d) should not be read woodenly so as to preclude such relief in the interlocutory situation, particularly given its limited purpose to protect the finality of judgments. This would appear to be so inasmuch as the finality interest is in no way affected by the vacation and reentry of a certification under § 1292(b) before a final judgment has been entered.
 
 
 30
 Even final judgments have not been totally shielded from the interlocking relationship between Rules 77(d) and 4(a). Courts, in certain circumstances, have been willing to ignore the apparent restriction on the type of relief that they can afford for lack of notice. Some courts, for example, have utilized Rule 60(b)[28] to vacate final judgments where the parties have not received actual notice, the successful litigant has not been prejudiced, substantial rights are involved, and a petition for vacation has been made promptly.[29] These tribunals rationalize that they are not abrogating the basic principle underlying the need for finality of judgments since a party cannot rely on finality when he lacks knowledge of the judgment itself. Another court has said that the policy of finality must give way in limited situations, including those in which there is an absence of prejudice to one party and the presence of prejudice to the other.[30]
 
 
 31
 Certainly, if an appellant may, for good reason, escape the effect of Rule 77(d) with regard to final judgments, the type of judgments that the rule was narrowly tailored to protect, there is no sound reason why he may not also avoid its effect on interlocutory orders. The rationale of Hill v. Hawes is still instructive, even though its result no longer obtains. After acknowledging that Rule 60(b) did not apply to that case, the Supreme Court stated:
 
 
 32
 (W)e think it was competent for the trial judge, . . . in the exercise of a sound discretion, to vacate the former judgment and to enter a new judgment of which notice was sent in compliance with the rules. . . . (T)he judgment was still within control of the trial judge for such action as was in the interest of justice to a party to the cause.[31]
 
 
 33
 Just as in Hill, Rule 60(b) would appear to be inapplicable here because its operation is confined to judgments, orders and proceedings that are final. Nevertheless, the Supreme Court suggested in Hill that a district court retains broad power over its interlocutory orders before a final judgment is entered. It may modify, vacate, or set them aside at any time before the final decree.[32] Consequently, we do not read Rule 77(d) and its precursors to forestall the district court from granting relief because of its own failure to provide adequate notice to the defendants. It was in response to defendants' petition that the district court entered the certification in the first instance. As a result, it was not unreasonable for the defendants to await notice of any action which had been taken on their petition especially since no party has been prejudiced by the reentry of the certification order.
 
 E.
 
 34
 We hold, therefore, that the district court did not err when it vacated and reentered its certification order so as to allow a timely appeal when neither party had actual notice of the entry of the order because of dereliction on the part of the district court, the party prevailing in the district court was not prejudiced, and the losing parties had moved promptly to vacate the order after learning of its entry.
 
 
 35
 II. STATE ACTION.
 
 
 36
 Having decided that this Court had the power to entertain the interlocutory appeal, we now turn to the obdurate question of state action.
 
 
 37
 Because every claim based on § 1983 requires state action as a jurisdictional prerequisite,[33] we must determine whether the district court erred in refusing to dismiss the complaint on the ground that the University of Pittsburgh was not acting "under color of" state law.[34] In so doing, we recognize that, since the dismissal motion was submitted by Pitt, Dr. Braden, as the opposing party, is entitled to the benefit of all reasonable doubts and inferences which may arise in connection with the consideration of such motion.[35]
 
 
 38
 In support of their motion to dismiss the complaint, the appellants contend that the University is a private educational institution and is not so involved with the Commonwealth of Pennsylvania that its activities fall under the concept of color of state law. Dr. Braden, in response, maintains, in effect, that the University is a state-related school with such a close and continuing relationship with the Commonwealth that it cannot be concluded, at this stage in the proceedings, that state action is lacking.
 
 
 39
 Declining to dismiss Dr. Braden's complaint, the district judge ruled that the relationship between Pitt and the Commonwealth is such as to preclude a summary determination that the activities of the educational institution occur outside the ambit of state action. As we do not believe that such a disposition is erroneous, we affirm.
 
 A.
 
 40
 At the inception of our analysis of the state action issue, we recognize the consequences of sustaining the refusal by the trial judge to declare that Pitt is not clothed with the mantle of the Commonwealth. Should this case be allowed to proceed, and state action ultimately be held to exist, then the University may be subjected to some of the constitutional and statutory strictures ordinarily applied to the state. Not only may Pitt have to answer for alleged violations of portions of the Bill of Rights and the 14th Amendment, but it may be liable under the statutory counterparts to such constitutional provisions as well. Because the burdens that may radiate from a decision upholding the district court may be potentially quite far-reaching, this issue should be dealt with in a full and thoughtful fashion.[36]
 
 
 41
 Also, it should be observed that the difficulties of drawing a line between state and private action are by now well-recognized.[37] This is so because the realms of the government and the private sector are not as clearly defined as they were during the epoch in which the 14th and 15th Amendments the sources of the statutory claim in question were adopted. Today, the federal courts, with ever-increasing frequency, are called upon to judge whether the conduct of ostensibly nongovernmental entities is such as to warrant the application of constitutional and statutory requirements to them.
 
 
 42
 It becomes our task to consider whether, given the legal precedents and factual setting at hand, the relationship between the University of Pittsburgh and the Commonwealth supports the decision of the trial judge that, at least on the available record, the activities of that educational institution cannot be deemed to be devoid of state action. In undertaking such a consideration, we must, of course, be aware that, although we are required to decide the controversy before us, this does not mean that the present case may be disassociated from the past or unrelated to the future.
 
 B.
 
 43
 On several occasions, the Supreme Court has endeavored to decide when the participation of a state in an otherwise private activity is so significant that the acts of the seemingly private enterprise are to be considered state action. While the leading cases may serve as guidelines for our inquiry here, no attempt has been made by the Supreme Court, as of yet, to reconcile what may appear to be conflicting pronouncements on state action. Nor has the Court thus far sought to delineate a unitary theory of state action.
 
 
 44
 Although the Supreme Court frequently has written on the subject of state action, the two opinions most pertinent to the case at bar are Burton v. Wilmington Parking Authority[38] and Jackson v. Metropolitan Edison Co.[39] Not only did the Court reach divergent results in these cases, finding state action in the former though not in the latter, but the mode of analysis in each opinion is dissimilar. It is incumbent upon this Court to determine which, if either, of these cases Burton or Jackson may control the present situation and, in so doing, whether Jackson has superseded Burton as the preeminent declaration on state action with respect to circumstances such as we have here.
 
 
 45
 In Burton, the Court held that a private restaurant owner who refused service to a customer because of his race, violated the Fourteenth Amendment where the restaurant was located in a building owned by a state-created parking authority and leased from that authority. After a thorough review of the relationship between the restaurant and the authority, the Supreme Court concluded that the state had "so far insinuated itself into a position of interdependence with (the restaurant) that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment."[40] It is thus apparent that the dispositive factor in Burton, with respect to the state action issue, was the extent and nature of the overall relationship between the state agency and the private enterprise.
 
 
 46
 Decided thirteen years after Burton, Jackson concerned a different type of nongovernmental entity, namely, a privately owned and operated utility corporation. The utility was, however, subject to extensive state regulation in many particulars of its business. When the utility company terminated the electric service of a customer without notice, without a hearing, or without an opportunity to pay any amounts due, the customer charged that she had been denied due process. The Supreme Court rejected the due process claim on the ground that, since state action was not present, the utility was exempt from constitutional commands. It held that the Commonwealth of Pennsylvania was not sufficiently connected with the challenged termination to make the conduct of the private utility corporation attributable to the state for purposes of the Fourteenth Amendment.
 
 
 47
 Important to the inquiry here is the analytical formula set forth in Jackson respecting state action. For the Supreme Court stated there that, when considering the vexing state action issue, the "inquiry must be whether there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself."[41]
 
 
 48
 Appellants maintain that this "close nexus" test, rather than the "relationship" approach of Burton, should be applied in the case at bar. They contend that, for state action to exist, the Commonwealth must be closely involved with the challenged employment practices of the University. In so arguing, appellants imply that the vitality of Burton has been severely undermined by Jackson, and that the existence of a pervasive relationship between the Commonwealth and the University is not, standing alone, sufficient to undergird a ruling of state action.[42] While Jackson may invite some concern as to the present status of Burton, we do not find appellants' reading of these cases to be convincing. To the contrary, in our view, Burton retains viability, and so its teachings may well bear on the present inquiry.
 
 
 49
 Based on a review of the Supreme Court's opinion in Jackson, we believe that that decision would not preclude application of the precepts of Burton here, should the appropriate state-private relationship exist. Instead of overruling Burton, the Jackson Court merely distinguished the earlier opinion, finding "absent in (Jackson ) the symbiotic relationship presented in Burton . . . ."[43] The implication arising from such efforts at differentiation is not that Burton was supplanted by Jackson, but rather that Burton remained as a powerful precedent with which the Court had to contend. Moreover, the Jackson opinion repeatedly cites Burton with apparent approval,[44] hardly sounding the death knell for Burton that the appellants would have us perceive.
 
 
 50
 It may be that only in the absence of an inextricably-linked relationship between the state and a private entity does the "close nexus" test of Jackson come into play. Where a private enterprise stands, in its operations, as a veritable partner with the state, then it seems proper to hold such enterprise subject to the same constitutional requirements to which the state is accountable. But the situation may be otherwise where no pervasive state-private relationship exists. For without such an arrangement, there would appear to be no basis for holding a private entity to constitutional strictures, unless the state is closely involved in the very activity challenged by a litigant.[45] Thus, as we understand it, Burton and Jackson stand as two models of state-action analysis that have been designed by the Supreme Court to date, with the applicability of either approach resting on the type of setting which may be present.[46]
 
 C.
 
 51
 Having concluded that Burton retains vitality, we must examine the available materials concerning the nature and extent of the connection between the University of Pittsburgh and the Commonwealth. We do so to resolve whether the principles of Burton may control this appeal as well as to ascertain whether the district court's conclusion as to state action should be upheld. Such determinations often depend largely on the factual matrix that obtains. Indeed, the Supreme Court declared in Burton that "only by sifting facts and weighing circumstances . . ." can matters turning on state action be resolved.[47] And such emphasis on the factual elements was echoed in Jackson as well.[48]
 
 
 52
 Pursuant to instructions rendered by this Court during the previous appeal, the district judge conducted an extensive evidentiary investigation respecting the factual facets of the state action question. As the trial court set forth its findings in an exhaustive fashion, it is not necessary to restate them at length. Rather, we shall highlight only those facts that are critical to the issue whether this action should have been dismissed.
 
 
 53
 With respect to the overall relationship between the University and the Commonwealth, a most telling factor is the University of Pittsburgh-Commonwealth Act[49] and the manner in which that legislation has been implemented. Such evidence would appear to indicate that the state is deeply enmeshed in operations of the University, including but not limited to its financing and its basic decision-making processes. Indeed, in light of the Act and the history of its effectuation, it is highly questionable whether the University may be described as a "purely private" institution, a characterization that would substantially immunize it from the dictates of the Constitution and the statutory progeny of that document.
 
 
 54
 Prior to the passage of the Act, Pitt was a private educational institution in dire financial straits.[50] At the initiative of the University, overtures were made to the State Board of Education in an effort to ameliorate Pitt's monetary troubles. While agreeing to afford the requested aid, the Commonwealth was not content merely to inject public funds into the ailing institution. Instead, as will become evident, it conditioned a massive infusion of moneys on a comprehensive restructuring of the University to reflect the needs of the Commonwealth.
 
 
 55
 In connection with the pre-enactment consideration of the legislation, the State Board of Education adopted a resolution in March, 1966 which called for increased enrollment of and reduced tuition for Pennsylvania students at Pitt. The resolution also stated that "the University's program must be responsive to the educational needs of the Commonwealth. . . ."[51] Similarly, in testimony before the district court regarding the statutes, a former Pitt Chancellor expressed the opinion that the Act represented a "commitment that the University has made to perform certain services for the state."[52] Such comments in the legislative history and elsewhere demonstrate that the relationship between the University and the Commonwealth was intended to be a close one.
 
 
 56
 That the University of Pittsburgh-Commonwealth Act is especially damaging to the appellants' contention that state action is lacking becomes immediately clear. The Pennsylvania legislature in its statutory program boldly announces:
 
 
 57
 (I)t is hereby declared to be the purpose of this act to extend Commonwealth opportunities for higher education by establishing University of Pittsburgh as an instrumentality of the Commonwealth to serve as a State-related institution in the Commonwealth system of higher education.[53]
 
 
 58
 And the body of the Act discloses that the proclamation of legislative policy, making the University a state "instrumentality" as well as a "state-related institution," is not empty verbiage. We are inclined to take the Commonwealth at its word, and, indeed, may well be obligated to do so at this point in the proceedings.
 
 
 59
 Examination of the Act, as adopted and implemented, suggests that the line of demarcation between the University and the Commonwealth was blurred, if not obliterated. Significantly, the legislation changed the name of the University to the "University of Pittsburgh Of the Commonwealth System of Higher Education."[54] Pitt's charter also was amended so that trustees appointed by the Governor of Pennsylvania, by the President Pro Tempore of the Senate and by the Speaker of the House constitute one-third of the voting members of the Board of Trustees.[55] In addition, the Act names several state officials as ex officio trustees, including the Governor, the State Secretary of Education, and the Mayor of Pittsburgh, thus seeming to ensure that governmental representation on the Board is rather substantial.[56]
 
 
 60
 The statutory program is not limited to a modification of the University's name or the composition of its Board of Trustees. It promises that there will be annual appropriations for Pitt.[57] And since the passage of the legislation, public funds have poured into the coffers of the University, averaging more than one-third of its total operating budget.[58] In fiscal year 1973-74, for example, the state appropriated roughly $48 million for Pitt, an amount representing over thirty-five per cent of the school's budget. And the generosity of the Commonwealth has increased with each passing year.
 
 
 61
 Under the University of Pittsburgh-Commonwealth Act, the state does not appear to provide annual appropriations with only minimal requirements respecting their use. Rather, Pitt may have surrendered much of its fiscal autonomy to the state, with the Commonwealth holding both the purse-strings as well as extensive financial control over the University.
 
 
 62
 In exchange for public funds, Pitt agreed to submit to stringent regulations of its fiscal and other affairs.[59] Under the Act, then, the Commonwealth has reserved the right to specify the purposes for or areas in which public funds may be spent. Substantial powers are vested in the Auditor General as well. Not only may that official audit the use of state funds and disallow any expenditures therefrom which he deems improper, but he retains the right to review the University's expenditures of non-state moneys.[60] Moreover, so as to ensure "proper accountability" on the part of Pitt, a comprehensive report detailing the amounts and purposes of all expenditures, from both state and private funds, must be filed with the Commonwealth. Consultations between the University and the state also are to be held respecting the entire budget.
 
 
 63
 In addition to the above features, the Act directs the Chancellor to submit an annual report to the Commonwealth regarding all University activities instructional, administrative and financial.[61] Furthermore, a 1972 amendment to the statutory arrangement requires detailed reports concerning, inter alia, the numbers of faculty and students as well as faculty teaching loads and salaries.[62] The information required under this addendum to the Act must be provided by each school and each department within the University.
 
 
 64
 Finally, the University of Pittsburgh-Commonwealth Act pledges capital development assistance to Pitt.[63] In essence, the benefits that state and authority programs for capital development bestow on wholly-owned state colleges are to be accorded the University as well. The state is authorized to acquire lands, construct facilities and lease or loan them to Pitt, and it has in fact done so. Through its General State Authority, the Commonwealth has provided about one-third of the University's buildings. Between 1966 and 1974, the cost of the construction for such building projects has totaled approximately $94 million. In addition, the Pennsylvania Higher Education Facilities Authority has financed various capital improvements for Pitt, including one project costing $6.5 million and another, roughly $600,000.[64]
 
 
 65
 All in all, the comprehensive statutory arrangement, carefully interweaving the functions of the University of Pittsburgh and the Commonwealth, and the manner in which it has been effectuated hardly suggests that state action does not exist. If anything, there would appear to be adequate grounds for believing that Pitt is vested with a status more closely akin to that of a state college rather than that of a private institution of higher education.
 
 
 66
 As we see it, there is an ample basis for concluding, at least at this time, that the relationship between Pitt and the Commonwealth may be "symbiotic" in a manner similar to that present in Burton. For the two entities, once denizens of separate societal realms, apparently are now dependent upon one another.
 
 
 67
 As discussed above, prior to adoption of the Act, the University desperately needed a source of funds to maintain its operations. The situation was described by Pitt officials and trustees as grave.[65] At the same time, the Commonwealth desired to satisfy the needs of the populace for expanded facilities for higher education. As the existing state educational institutions were insufficient to satisfy the public demand, and because the creation of new state universities would have been extremely expensive, the decision was made to incorporate established, but financially ailing private institutions into the Commonwealth system of higher education.[66] The state thus was able to satisfy the educational needs of its citizens at a cost considerably lower than would have been entailed by the creation of wholly new institutions. Concomitantly, Pitt was able to survive as an institution of higher education, even though it may have been forced to relinquish its traditional autonomy as a private facility.
 
 
 68
 Since the facts adduced thus far indicate that the relationship between the University of Pittsburgh and the Commonwealth is symbiotic in nature, or at least pervasive, we believe that the precepts of Burton may be applicable to the present appeal. Not only does it appear that the state in this situation, as in Burton, has "insinuated itself into a position of interdependence" with Pitt, but it seems to be a "joint participant" in the educational enterprise as well.
 
 
 69
 Moreover, the restaurant involved in Burton was situated in a public building, and the private entity leased its premises from the state.[67] In Jackson, the Supreme Court suggested that the "actual holding" of Burton might be limited to lessees of public property.[68] Even so, as previously indicated, many of the buildings within the Pitt complex were built by the state or its agencies with public funds and are leased to the University, including the very building within which Dr. Braden worked.[69] It follows that even if Burton and its "relationship" theory of state action should be limited to a "lease" situation, the present appeal still may be governed by the teachings of that landmark decision.[70] Consequently, the district court did not commit error when it declined to dismiss the complaint for a purported absence of state action.
 
 D.
 
 70
 Although the factual matrix as presented here, considered against the backdrop of Burton, supports the district court's refusal to dismiss the complaint, it still is appropriate to consider the pronouncements of the small number of courts which have confronted situations similar to the one at hand. Two such opinions fortify the decision that we reach today.[71]
 
 
 71
 Of these cases, the more pertinent is Isaacs v. Board of Trustees of Temple University,[72] a case which also concerned sex discrimination claims. In denying a motion for summary judgment raised by Temple University, Judge Higginbotham indicated that the activities of that educational institution constituted state action. He did so on facts which closely parallel those in the present appeal.
 
 
 72
 The Isaacs opinion places substantial weight on the Temple University-Commonwealth Act, an identical twin to the statutory program enacted on behalf of Pitt. Not only do the provisions of the Temple legislation virtually duplicate those of the Pittsburgh enactments, but both Acts were drafted with the same objectives in mind and at roughly the same time.[73] Like the Pitt Act, the Temple legislation was promulgated so that Temple could transcend crushing financial woes, while obligating that university to operate as an instrumentality of the Commonwealth and to serve the citizenry at large. After carefully reviewing the Temple-Commonwealth Act and the degree of state participation in that university, as we have done in the case sub judice, the Isaacs court stated that the "Commonwealth of Pennsylvania has so significantly involved itself in the affairs of Temple University that the latter's activities (constitute) 'state action' and action 'under color of' state law . . . ."[74] In our view such a conclusion may prove to be appropriate in the present appeal which closely tracks Isaacs.
 
 
 73
 It should be observed that Jackson was decided immediately after the opinion in Isaacs was rendered. Since Isaacs so heavily relies, quite properly, on Burton, the analysis presented by Judge Higginbotham remains valid only so long as Jackson is not construed to overrule or devitalize Burton. As we fail to so read Jackson, the principles espoused in Isaacs remain supportive of the conclusion reached by the trial judge that state action cannot be ruled out summarily in the case at bar.
 
 
 74
 Because Pennsylvania's system of state-related universities, which includes Pitt and Temple, seems to be relatively distinctive, it is not surprising that other legal precedents pertinent to the case at hand are lacking. However, one court of appeals has considered a situation which may be an analogue to the present one. In Powe v. Miles,[75] the Second Circuit dealt with an appeal from a dismissal of a complaint. The Powe suit challenged the suspension of students by Alfred University, a private educational institution, and by the New York State College of Ceramics, a school administered by Alfred under a contract with the State of New York. Speaking for a unanimous panel, Judge Friendly declared that the university administration was not acting under color of state law when it suspended students at Alfred proper, but was acting under color of state law when it disciplined students at the College of Ceramics.
 
 
 75
 Powe bears on our inquiry here because of its factual features as well as the method of analysis exhibited in that portion of the opinion focusing on the claims of the ceramics students. In evaluating whether the activities of the College of Ceramics could constitute state action, Judge Friendly relied quite heavily on a statutory program which set forth the arrangement between Alfred University and the State of New York.[76]
 
 
 76
 The legislation deemed to be so crucial in Powe is, in several important respects, markedly similar to the University of Pittsburgh-Commonwealth Act. For example, under the New York enactments, the State is to provide substantial funds as well as major buildings and facilities for the ceramics school.[77] Similarly, as in the case before us, the statutory scheme in Powe expressly denominates the College of Ceramics as a state institution. Finally, the New York legislation declares that Alfred is to serve as "the representative of the state university trustees"[78] a statement quite parallel to its correlative in the Pitt statutes.
 
 
 77
 In Powe, then, state legislation, and the manner in which it was implemented, proved to be the critical factor in the disposition of the state action issue regarding students at the College of Ceramics. We believe that Powe supports our emphasis on the statutory arrangement between Pitt and the Commonwealth. And it would appear that the result we reach today is consonant with that obtained in the Powe case.
 
 E.
 
 78
 While there are many other cases which have raised the question of state action with respect to institutions of higher education,[79] none of them contained a factual configuration similar to that here. Perhaps the most important of these cases, and one which is illustrative of the group, is Cohen v. Illinois Institute of Technology.[80] In Cohen, Judge (now Justice) Stevens, writing for a panel of the Seventh Circuit, sustained the dismissal of a complaint which tendered a § 1983 claim. Although the defendant university used the name "Illinois" in its institutional title, received some financial and other support from the state and was subject to certain regulations,[81] the Cohen court declined to rule that state action existed.
 
 
 79
 Nevertheless, Cohen would appear to be distinguishable from the case at hand chiefly because there is no statutory program which inextricably links I.I.T. to the State of Illinois. Contrary to the Pitt situation, the level of financial support offered I.I.T. by the state is minimal. Judge Stevens expressly stated that "the funds contributed by the State represent only a small fraction of the cost of educating the students . . . ."[82] In addition, I.I.T. selected its own institutional name, unlike the statutory designation of the University of Pittsburgh as a Commonwealth school. Moreover, the regulations imposed by the state are far less extensive in Cohen than in the present case. Basically, the Illinois provisions speak to the issue of accreditation and little else, whereas the University of Pittsburgh-Commonwealth Act is far more sweeping in its scope.
 
 
 80
 Perhaps the most important basis for distinguishing Cohen from this case is the absence there of other indicia of a close relationship between the state and the university, including, inter alia, (1) governmental participation in determining the composition of the board of trustees, (2) the review of the expenditure of private funds by state officials, (3) onerous reporting requirements; (4) a legislative history which discloses that the state desired to utilize the educational facilities of an existing institution rather than create new ones itself; and especially (5) the statutory declaration that Pitt is an "instrumentality" of the Commonwealth. Indeed, the Cohen opinion vigorously emphasizes that there was no "evidence that (I.I.T.) is . . . a State instrumentality . . . ."[83] Had there been such evidence in Cohen, the Seventh Circuit may well have reached an opposite result and found state action. By its own terms, then, Cohen constitutes a case considerably different from the one with which we are now concerned.
 
 
 81
 As a final point, we recognize that Cohen appears to have utilized the "close nexus" test of Jackson. The analysis of Judge Stevens turns, in part, on the absence of "some nexus between the State . . . and defendants' wrongful conduct. . . ."[84] Yet, it is important to bear in mind that Cohen applied the "close nexus" approach only after a careful evaluation of the facts revealed the absence of a tight bond between the state and the university. Following such factual scrutiny, Judge Stevens expressly concluded: "It is plain that the school is not so heavily dependent on the State as to be considered the equivalent of a public university . . . ."[85] By contrast, as discussed above, sufficient facts may have been produced here to undergird an eventual finding that there is a symbiotic relationship between the state and Pitt so as to bring the present case within the ambit of Burton, not Jackson or Cohen. Cohen thus would appear to lend limited support to the appellants' arguments that state action is lacking here.
 
 F.
 
 82
 In sum, we believe that the district court did not commit error in declining to dismiss the complaint for a purported want of state action. In our view, there were adequate grounds for refusing to rule that the relationship between the University of Pittsburgh and the Commonwealth of Pennsylvania is such as to forbid the application of the constitutional commands, and the statutory derivations therefrom, to the University.
 
 
 83
 Accordingly, the judgment of the district court will be affirmed and the case remanded for action consistent with this opinion.
 
 
 84
 GARTH, Circuit Judge, concurring.
 
 
 85
 I concur in Part I of the opinion of the Court, which concerns the power of a district court to vacate and to re-enter a certification order so as to allow an interlocutory appeal. I also concur in the result reached in Part II of that opinion, which, after discussing the issue of state action, leaves the ultimate determination of whether state action exists to the final hearing on the merits. I have written separately on the issue of state action, however, for two reasons. First, I believe several aspects of the opinion of the Court deserve special emphasis. Second, I wish to explain why I disagree with the Court's analysis of the relevant state action precedents.
 
 I.
 
 86
 In light of the opinion of the district court and the arguments advanced in this appeal by counsel for Dr. Braden, I think it is extremely important to emphasize the limited nature of this Court's holding.
 
 
 87
 As the opinion of the Court makes clear, this case is before us on interlocutory appeal from an order of the district court which did no more than to deny Pitt's motion to dismiss Dr. Braden's complaint under Fed.R.Civ.Proc. 12(b)(6). Since the district court, in ruling on that motion, considered matters outside the pleadings, Pitt's motion was converted by Fed.R.Civ.Proc. 12(c) into a motion for summary judgment. On appeal from the denial of that motion, it is obvious that the only question which is properly before us is the following: did the district court err in refusing to enter summary judgment in favor of Pitt on the issue of state action?
 
 
 88
 Despite the limited nature of the question presented by the denial of Pitt's motion for summary judgment, counsel for Dr. Braden has called our attention to certain dicta in the opinion of the district court and has urged us to decide a much broader question. Although the district court did no more than to deny Pitt's motion, its opinion concluded with the categorical statement that "Pitt was acting under 'color of state law' when it engaged in the activity challenged by Dr. Braden." 392 F.Supp. at 126. See also id. at 124-25. In this Court, counsel for Dr. Braden has pointed to this language as the "finding" of the district court and has urged us to affirm it. Brief for Appellee at 67. See also id. at 6, 49-50. In effect, therefore, counsel for Dr. Braden has asked this Court to treat the order of the district court as one which not only denied Pitt's motion for summary judgment but as one which also granted partial summary judgment in favor of Dr. Braden, even though she did not file a cross-motion and could not have been granted that relief even if she had.
 
 
 89
 In view of this background, I believe it is important to emphasize that this Court has not treated the order of the district court as one granting partial summary judgment for Dr. Braden but merely as one denying Pitt's motion for summary judgment. Maj.Op. 949, 954, 955 and 965. This Court has decided only that "the district court did not commit error in declining to dismiss (Dr. Braden's) complaint for a purported want of state action." Id. at 965. This Court has not decided either that state action is or is not present in this case. Id. at 955, n.35, 965. That question remains completely open. As I understand it, nothing in the opinion of this Court would preclude the district court on remand from determining either that state action is or is not involved in this case. Nor is there anything in that opinion which would preclude this Court from reaching either result should this case again come before us on appeal from the final judgment of the district court. It goes without saying, therefore, that, as the opinion of the Court notes, our affirmance of the order of the district court may not and should not be taken as any indication that we approve of "certain language in the opinion of the district judge" which "seems to indicate affirmatively that state action exists." Id. at 955 n.35.
 
 
 90
 Finally, I think that one of this Court's observations in Braden v. University of Pittsburgh, 477 F.2d 1 (3d Cir. 1973) (Braden I ), also deserves emphasis. In Braden I, it seems to me, this Court recognized that the state action issue which this case presents is not suited for resolution by means of summary judgment. We concluded by stating:
 
 
 91
 This is an important case and we are entitled to a carefully prepared record after full hearing in the trial court and to the views of the trial court upon such a record.
 
 
 92
 (Emphasis added.) Id. at 8. Accord Weise v. Syracuse University, 522 F.2d 397, 408 (2d Cir. 1975) (relying on Braden I ).
 
 
 93
 I believe that this observation is as true today as it was when Braden I was decided. The Supreme Court has frequently warned that "(o)nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." (Emphasis added). Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). See also Moose Lodge No. 107 v. Irvis, 407 U.S. 162, 172, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Since a district court, in ruling on a motion for summary judgment, is required to give the party opposing the motion the "benefit of all reasonable doubts and inferences,"[1] the court is not entitled to and cannot "sift" the facts it believes to be important from those it regards are insignificant. Nor can the court attribute to each fact the weight which it believes it deserves. Every fact must be "sifted" and "weighed" against the moving party. As a result, it seems obvious to me that summary judgment procedures are poorly suited for deciding state action questions such as that posed by this case. Where the nub of a state action claim rests upon statutes, case law, or regulations, summary judgment may well be proper.[2] But where, as in this case, the practical working relationship between the state and the private entity is at issue, it seems clear that summary judgment will be proper only in the most obvious cases. This is not such a case.
 
 II.
 
 94
 I believe that it is also important to emphasize that the summary of the relationship between Pitt and the Commonwealth contained in Part IIC of the opinion of the Court must not be read out of context.
 
 
 95
 At the beginning of its discussion of the state action question, the opinion of the Court recognizes that "since the dismissal motion was submitted by Pitt, Dr. Braden, as the opposing party, is entitled to the benefit of all reasonable doubts and inferences which may arise in connection with the consideration of such motion." Maj.Op. at 955. As I understand Part IIC of the opinion of the Court, it represents an application of this rule to the facts of this case. As a result, in that portion of its opinion, the Court gives Dr. Braden the benefit of all reasonable doubts and inferences with respect to every fact which bears upon the relationship between the Commonwealth and the University. I believe it is important, therefore, to emphasize that Part IIC of the opinion of the Court must be read only as a summary of that relationship as we are obliged to view it at this stage of the proceedings. At the final judgment stage, the district court may and undoubtedly will be required to view the facts quite differently. In addition, should this case again come before this Court on appeal from the final judgment of the district court, we will then be constrained to consider the facts from a very different perspective. A few illustrations will make this point clear.
 
 A.
 
 96
 The opinion of the Court, giving Dr. Braden the benefit of all reasonable doubts and inferences, apparently attaches considerable significance to the language of Pa.Stat.Ann. Tit. 24, § 2510-202 (Supp.1976), which characterizes Pitt as an "instrumentality of the Commonwealth" and a "State-related institution." Maj.Op. at 959. At the same time, the Court ignores the testimony of the trustees concerning the effect which this provision has on the actual administration of the University, presumably because that testimony was highly damaging to Dr. Braden.[3] See 392 F.Supp. at 121-22. While this treatment of the evidence is unobjectionable at this stage of the proceedings, at the final judgment stage the district court will obviously have to view the evidence quite differently. It will have to consider both the language of the statute and the testimony of the trustees which Braden I required the district court to take.[4] In addition, since Dr. Braden will not automatically be given the benefit of all reasonable doubts and inferences at that stage, the district court will be free to give the language of the statute and the testimony of the trustees the weight which it believes they deserve.
 
 B.
 
 97
 The opinion of the Court places great emphasis upon the Commonwealth's authority to appoint one-third of Pitt's board of trustees (Maj.Op. at 959), while failing to mention the evidence concerning the trustees which Braden I required the district court to assemble.[5] In Braden I, this Court stated:
 
 
 98
 We cannot decide this case in a semi-vacuum. We do not know, for example, the number of trustees which the University actually has, their names, their tenure of office, and who and what they are, their occupations and connections, and whether or not they are paid for their services or meetings or receive salaries or emoluments, and if so, by whom are these emoluments or salaries paid and what do they amount to.
 
 
 99
 477 F.2d at 5.
 
 
 100
 On remand, the district court took evidence on all these points. That evidence revealed that the backgrounds and occupations of the trustees appointed by the Commonwealth were remarkably similar to those of the other trustees.[6] It is also showed that most of the trustees in both groups were prominent private citizens with few ties to the Commonwealth. In addition, as the district court stated:
 
 
 101
 4. The voting record of individual trustees is not kept, but, according to the testimony, the trustees appointed by the Commonwealth have never acted in a bloc.
 
 
 102
 5. All trustees, except the Chancellor, serve without compensation.
 
 
 103
 392 F.Supp. at 121.
 
 
 104
 At the final judgment stage, the district court will be required to take all this evidence into account and to give it the weight which it merits.[7]C.
 
 
 105
 The opinion of the Court concludes that "Pitt may have surrendered much of its fiscal autonomy to the state, with the Commonwealth holding both the purse-strings as well as extensive financial control over the University." Maj.Op. at 960. It must be emphasized, however, that the Court reaches that conclusion only because it gives Dr. Braden the benefit of all reasonable doubts and inferences, as it is required to do at this stage of the proceedings.
 
 
 106
 The opinion of the Court, for example, infers that the Auditor General's authority to review the University's expenditure of non-state moneys gives him considerable control over the University's finances. Maj.Op. at 960. At the same time, the Court gives little weight to the testimony in the district court which suggested that the Auditor General "reviewed" the expenditure of Pitt's private funds only in order to determine how much the Commonwealth should contribute. Appendix at 101a. At the final judgment stage, the district court will be required to weigh all this evidence and to make a finding on this disputed issue of fact.[8]
 
 
 107
 The opinion of the Court also infers from the fact that Pitt is required to make various annual reports to the Commonwealth that the Commonwealth exercises significant control over Pitt's finances. Maj.Op. at 960. At the final judgment stage, however, when Dr. Braden will not automatically be given the benefit of all reasonable doubts and inferences, the district court will be required to weigh the evidence and to make findings with respect to whether the Commonwealth has utilized these reporting requirements to "control" Pitt.[9]
 
 
 108
 The opinion of the Court fails to give any significance to Pa.Stat.Ann., tit. 24, § 2510-205 (Supp.1976), which vests the "entire management, control and conduct of the . . . financial affairs of the university . . . in the board of trustees." Maj.Op. at 960 n.59. It also fails to mention the testimony in the district court which revealed that the Commonwealth places no restrictions on Pitt's freedom to use its private funds as it sees fit. Appendix at 478a-79a. At the final judgment stage, this evidence will obviously have to be taken into account.
 
 
 109
 Finally, the opinion of the Court places heavy reliance upon the percentage of Pitt's annual budget which the Commonwealth contributes. While I believe that it is permissible to rely upon that factor at this stage of the proceedings, at the final judgment stage the district court will have to consider this Court's twin warnings in Hollenbaugh v. Carnegie Free Library, 545 F.2d 382 (3d Cir. 1976). In Hollenbaugh, this Court cautioned that " 'receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government.' " Id. at 385, quoting Grossner v. Trustees of Columbia University, 287 F.Supp. 535, 547-48 (S.D.N.Y.1968). Accord, Maj.Op. at 960 n.58. This Court also warned that state action questions ought not to turn upon the precise percentage of an institution's budget which is contributed by the state. Hollenbaugh v. Carnegie Free Library, supra, at 384-85. At the final judgment stage, these two principles will, in my view, preclude extensive reliance upon the percentage of Pitt's operating budget contributed by the Commonwealth.[10]
 
 
 110
 In short, it must be stressed that the Court's conclusion with respect to the financial control which the Commonwealth exercises over the University will not necessarily be valid at subsequent stages of this litigation. That conclusion as well as all the factual statements contained in Part IIC must not and cannot be read out of the context of a 12(b)(6) or summary judgment motion.
 
 III.
 
 111
 While I agree with the majority of the Court that the district court was correct in denying Pitt's motion for summary judgment (see Part IV of my opinion), I do not agree with the state action standards employed by the Court in reaching that conclusion. I therefore feel compelled to express the reasons for my disagreement.
 
 A.
 
 112
 I am, to be frank, rather perplexed by the Court's analysis of the state action standards which apply in this case. After identifying Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), as the two most pertinent Supreme Court precedents and after summarizing the holdings of those two cases (Maj.Op. at 956-957), the Court observes that Burton was not overruled by Jackson. Id. at 957. The Court then virtually ignores Jackson and proceeds to apply Burton to the facts of this case. I believe there are two flaws in the majority's analysis.
 
 
 113
 First, I think the Court has greatly oversimplified the evolution of the Burton theory of state action by flatly equating Burton with the "overall relationship" test. The majority constructs that equation by focusing upon a single sentence in the Burton opinion.[11] But the Burton Court stated specifically and at some length that it was not announcing a state action "test" of general applicability. 365 U.S. at 725-26, 81 S.Ct. 856. More importantly, the facts in Burton were such that state action could certainly have been found under either the "overall relationship" test or the "nexus" test. While the state and the restaurant undoubtedly had a close overall relationship, the state was also deeply implicated in the very acts of the restaurant which were challenged, i. e., its refusal to serve blacks. Burton states that "it (cannot) be ignored especially in view of Eagle's affirmative allegation that for it to serve Negroes would injure its business, that profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." Id. at 724, 81 S.Ct. at 861. As a result, it is not at all "apparent that the dispositive factor in Burton . . . was the extent and nature of the overall relationship between the state agency and the private enterprise." Maj.Op. at 957.[12]
 
 
 114
 The second flaw in the majority's analysis is its failure to consider the gloss which subsequent opinions have placed upon Burton. The majority opinion, after noting that Burton has not been overruled by subsequent cases, apparently leaps to the conclusion that Burton can now be applied without even considering the interpretations of Burton contained in more recent Supreme Court opinions. Although Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and Jackson both discussed Burton at length, the majority for the most part ignores that discussion. I must take exception to this approach. We cannot turn the clock back 16 years and read Burton as if Moose Lodge and Jackson had never been decided. Any discussion of Burton in 1977 must consider the extent to which subsequent Supreme Court cases have clarified or modified the meaning of that decision. I believe that a brief examination of those cases reveals that the question which Burton left open whether the "overall relationship" test or the "nexus" test is the correct one has now been answered in favor of the "nexus" standard.
 
 
 115
 The first Supreme Court case to analyze Burton closely was Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), in which the Court reversed Irvis v. Scott, 318 F.Supp. 1246 (M.D.Pa.1970) (three-judge court).[13] Irvis v. Scott, supra, had relied upon Burton in holding that the acts of racial discrimination of a private club were infused with state action. Writing for the three-judge court, Judge Freedman had noted that Pennsylvania had granted the club a liquor license and had regulated its activities extensively. He had concluded that "(i)t would be difficult to find a more pervasive interaction of state authority with personal conduct." 318 F.Supp. at 1250. As a result, the district court had held that "(a)s in Burton the state has 'insinuated itself into a position of interdependence' with its club licensees . . . ." Id. at 1251. In reversing the district court, the Supreme Court did not dispute the pervasive nature of the "overall relationship" between the state and the club. The Court wrote:
 
 
 116
 The District Court was at pains to point out in its opinion what it considered to be the "pervasive" nature of the regulation of private clubs by the Pennsylvania Liquor Control Board. . . .
 
 
 117
 However, detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination. . . .
 
 
 118
 We therefore hold that, with the exception hereafter noted, the operation of the regulatory scheme enforced by the Pennsylvania Liquor Control Board does not sufficiently implicate the State in the discriminatory guest policies of Moose Lodge to make the latter "state action" within the ambit of the Equal Protection Clause of the Fourteenth Amendment. (Emphasis added.)
 
 
 119
 Id. at 176-77, 92 S.Ct. at 1973. If, as the majority suggests, state action can now be found based solely upon a pervasive "overall relationship," then the Supreme Court's decision in Moose Lodge is hard to understand.[14]
 
 
 120
 In Gilmore v. City of Montgomery, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974), the Court stated flatly that the Burton test requires a nexus between the state and the very activity challenged. In Gilmore the Court affirmed an order enjoining the city from allowing private segregated schools to have the exclusive use of municipal recreational facilities. Discussing Burton and Moose Lodge in his opinion for the Court, Justice Blackmun wrote:Because the city makes city property available for use by private entities, this case is more like Burton than Moose Lodge. The question then is whether there is significant state involvement in the private discrimination alleged. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Burton v. Wilmington Parking Authority, supra; Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Moose Lodge No. 107 v. Irvis, supra. (Emphasis added.)
 
 
 121
 The Court's most extensive discussion of Burton occurred in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), which held that state action was not present when a privately owned and operated utility company terminated a customer's electric service without giving her notice, a hearing, or an opportunity to pay amounts due. Jackson reached this conclusion despite the fact that the state was involved "in virtually every phase of the company's business." 419 U.S. at 368, 95 S.Ct. at 462 (Marshall, J., dissenting). In addressing the Burton theory of state action, Jackson first pointed out the factual distinctions between that case and Burton. Then, after summarizing the substantial connections between the state and the utility, it concluded:
 
 
 122
 Under our decision this is not sufficient to connect the State of Pennsylvania with respondent's action so as to make the latter's conduct attributable to the State for purposes of the Fourteenth Amendment. (Emphasis added.)
 
 
 123
 Id. at 358, 95 S.Ct. at 457. Jackson also observed that the proper "inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." (Emphasis added.) Id. at 351, 95 S.Ct. at 453.
 
 
 124
 In conclusion, it appears to me that Moose Lodge, Gilmore, and Jackson place a gloss upon Burton which we are not free to ignore. The teaching of those cases is that "neither general government involvement nor even extensive detailed state regulation is sufficient for a finding of state action. Rather, the state must affirmatively support and be directly involved in the specific conduct which is being challenged." (Footnote omitted.) Cannon v. University of Chicago, Nos. 76-1238/9 (7th Cir., filed August 27, 1976) at 5.
 
 B.
 
 125
 With the exception of Hollenbaugh v. Carnegie Free Library, supra, which is discussed below, this Court's recent state action opinions have all employed the "nexus" test rather than the "overall relationship" approach. Broderick v. Associated Hospital Service of Philadelphia, 536 F.2d 1, 4-6 (3d Cir. 1976) (per Garth, J.); Magill v. Avonworth Baseball Conference, 516 F.2d 1328, 1332-33 (3d Cir. 1975) (per Aldisert, J.); Gibbs v. Titelman, 502 F.2d 1107, 1111-12 (3d Cir. 1974) (per Hunter, J.); Jackson v. Metropolitan Edison Co., 483 F.2d 754, 756 (1973) (per Weis, J.), aff'd., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).
 
 
 126
 In Broderick this Court stated: "For state action to be found where the impetus for the discrimination is private, the record must demonstrate that the state has become significantly involved with the discriminatory action alleged." (Emphasis added.) 536 F.2d at 4. Broderick never even referred to the "overall relationship" test.
 
 
 127
 In Magill we grouped the Supreme Court's state action cases into three general categories. 516 F.2d at 1331. Magill placed Burton in the second group cases in which "the state 'significantly' involved itself with the private party." Id. at 1331-32. Describing the test applicable to cases falling into the second group, Magill stated that "the polestar of our analysis must be whether the state involvement in the challenged action is 'significant.' " (Emphasis added.) Id. at 1332. Magill refers to the "nexus" test (Id.), but it never even mentions the "overall relationship" test. Gibbs and this Court's opinion in Jackson treated the issue of state action similarly. The majority makes no attempt to reconcile its state action analysis with the language or the holdings in Broderick, Magill, Gibbs, or this Court's opinion in Jackson.
 
 
 128
 In short, I believe that the recent state action cases decided by this Circuit, as well as those decided by the Supreme Court, all establish that in order for state action to be found "the record must demonstrate that the state has become significantly involved with the discriminatory action alleged." (Emphasis added.) Broderick v. Associated Hospital Service of Philadelphia, supra, at 4. In most cases, it will be impossible to conclude that state action is present under this standard unless there is proof which connects the state with the very activity challenged. However, it seems obvious to me that such proof would not be necessary in one limited situation, viz., where the state's involvement with a private entity is "so dominant as to afford basis for a contention that the state is merely utilizing private trustees to administer a state activity." Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968). See also Cohen v. Illinois Institute of Technology, 524 F.2d 818, 825 & n.19 (7th Cir. 1975) (per Stevens, J.); Wahba v. New York University, 492 F.2d 96, 101 (2d Cir. 1974); Kerr v. Enoch Pratt Free Library of Baltimore, 149 F.2d 212 (4th Cir. 1945). In a situation of that nature, I believe that state involvement in the challenged activity could simply be assumed.
 
 
 129
 This Court recently considered a situation of this type in Hollenbaugh v. Carnegie Free Library, supra, in which a library received approximately 90 per cent of its financial support from the Commonwealth of Pennsylvania and its subdivisions and in which a large segment[15] of the library's board of trustees was composed of government officials. In that case this Court reviewed a district court order which dismissed a complaint raising Fourteenth Amendment claims for failure to allege facts constituting state action. In reversing, this Court suggested that the extreme state involvement which was alleged in that case could without more constitute state action. It went on to say that "it is impossible to distinguish the state's involvement in the allegedly discriminatory employment determination from the state's involvement in the general operation of the library." Id. at 385. Hollenbaugh is consistent with the analysis above. I read it to say that where a state has funded an institution to the extent of almost 100 per cent of its financial requirements, it is reasonable to assume that with such massive funding the state must be chargeable with all activities undertaken by the institution. However, short of the type of involvement alleged in Hollenbaugh, I believe that proof of state involvement in the very activity challenged is required.
 
 
 130
 In sum, I interpret the Supreme Court's and this Circuit's recent state action decisions to require either (a) state involvement with a private entity which is "so dominant as to afford basis for a contention that the state is merely utilizing private trustees to administer a state activity"[16] and therefore has necessarily participated in the challenged activity, or (b) proof that the state has affirmatively supported or is directly involved in the specific conduct challenged.
 
 C.
 
 131
 I must also express my disagreement with the discussion contained in Parts II D and E of the opinion of the Court. Those sections, in my view, constitute a wholly inadequate analysis of the manner in which other federal courts have dealt with state action claims lodged against private universities.
 
 
 132
 First, the Court's heavy reliance upon Isaacs v. Board of Trustees of Temple University, 385 F.Supp. 473 (E.D.Pa.1974), appears to me to be misplaced. As the Court notes, Isaacs was decided prior to the Supreme Court's decision in Jackson. There is good reason to believe that the analysis in Isaacs would have differed significantly had that case been decided after Jackson. The analysis in Isaacs rests on the premise that "(t)he leading case in the entire 'state action' area is Burton v. Wilmington Parking Authority. . . ." 385 F.Supp. at 487. In light of Jackson, the notion that Burton is the "leading case in the entire 'state action' area" is plainly untenable.
 
 
 133
 Second, the Court's treatment of Powe v. Miles, 407 F.2d 73 (2d Cir. 1968), simply will not bear analysis. In Powe the Second Circuit held that the suspension of students enrolled in Alfred University's four private colleges was not state action but that the suspension of students enrolled at the New York State College of Ceramics at Alfred University, a state college affiliated with Alfred, was action under color of state law. The Court attempts to analogize the relationship between the Commonwealth and Pitt to the relationship between the State of New York and the New York State College of Ceramics. In doing so, the Court neglects to mention several significant facts. Most important, the Court fails to note that New York State paid 100 per cent of the direct expenses of the New York State College of Ceramics.[17] Id. at 76. The Court also fails to note that the New York State College of Ceramics, which was founded as a state institution,[18] remains a "state school" under New York law,[19] as distinguished from a "state-related institution" such as Pitt.[20]
 
 
 134
 Although the Court relied upon Powe to support its state action analysis, that case may actually be quite damaging to the Court's position. In Powe, the Second Circuit held that the suspension of students enrolled in Alfred's private colleges was not state action despite the fact that during the year in question the State of New York paid 20.75 per cent of the total Alfred budget. 407 F.2d at 76. As one commentator has noted, Powe also concluded that the suspension of the Alfred students was not state action even though "the state paid about a third of the salary of the Dean of Students who imposed the suspension." (Emphasis in original). O'Neil, Private Universities and Public Law, 19 Buffalo L.Rev. 155, 160 (1970). In addition, the state action test employed in Powe by Judge Friendly was a precursor of the "nexus" standard enunciated in Moose Lodge and Jackson. In Judge Friendly's words, under his test:
 
 
 135
 The state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of complaint.
 
 
 136
 407 F.2d at 81. This test, as Professor O'Neil has noted, "put aside (Alfred's) interdependence and close involvement with the state." O'Neil, supra, at 159.
 
 
 137
 Third, I agree with the Court that Cohen v. Illinois Institute of Technology, 524 F.2d 818 (7th Cir. 1975) (per Stevens, J.), is highly relevant, but I believe that Judge (now Justice) Stevens's analysis of the appropriate state action standards is exactly the same as mine and consequently at odds with the view expressed by the majority of the Court. In Cohen, Judge Stevens employed a two-part state action test. As the Court acknowledges, one part of his formulation was the "nexus" test of Jackson. Maj.Op. at 965. The second part of the test, as the Court notes, is whether the ostensibly private institution is "so heavily dependent on the State as to be considered the equivalent of a public university for all purposes and in all its activities." 524 F.2d at 825, quoted in Maj.Op. at 965. To explain what he meant by that statement, Judge Stevens cited Judge Friendly's observation in Powe v. Miles, supra, at 82, that state action could be found, even absent a "nexus" between the state and the specific conduct challenged, "where the wholly state-supported activity is so dominant that the private activity could be deemed to have been swallowed up." 524 F.2d at 825 n.19, quoting Powe v. Miles, 407 F.2d 73, 82 (2d Cir. 1968). See Hollenbaugh v. Carnegie Free Library, supra. This language was simply a restatement by Judge Friendly of the point he had made earlier that state action could be found where the state's involvement with the private entity was "so dominant as to afford basis for a contention that the state is merely utilizing private trustees to administer a state activity." 407 F.2d at 81. As I noted earlier, in a case of that nature, I agree that proof of a nexus need not be shown. But that is quite different from saying, as the Court does, that a nexus need not be shown whenever there is simply a close overall relationship between the state and the private entity.
 
 
 138
 Fourth and finally, I must disagree with the Court for failing to appreciate the relevance of our sister Circuit's recent state action cases involving private universities. It seems to me that, in addition to Cohen v. Illinois Institute of Technology, supra, the following cases are particularly pertinent: Cannon v. University of Chicago, Nos. 76-1238/9 (7th Cir., filed August 27, 1976) at 5; Berrios v. Inter American University, 535 F.2d 1330 (1st Cir. 1976); Greenya v. George Washington University, 167 U.S.App.D.C. 379, 512 F.2d 556 (1975); Spark v. Catholic University of America, 167 U.S.App.D.C. 56, 510 F.2d 1277 (1975). While I will not discuss these cases at length, their general perspective can perhaps best be summarized by the First Circuit's words in Berrios: "we approach with some caution any labelling that might incidentally contribute to the erosion of the autonomy and diversity of private colleges and universities." 535 F.2d at 1333.
 
 IV.
 
 139
 Although I disagree with the state action analysis contained in the opinion of the Court, I believe that affirmance of the order of the district court is required even under the correct state action "nexus" standard described in Part III supra. I reach this conclusion because I believe that genuine issues of material fact exist with respect to the state action requirements. In addition, as I stated above, I am convinced that summary judgment procedures are poorly suited for deciding state action questions when the practical rather than the formal relationship between the state and the private entity is at issue. When the practical working relationship is at issue, it seems obvious that, except in the most clear-cut instances, the issue of state action should not be decided until after the district court has made its required findings of fact. For example, the district court opinion summarizes some of the evidence which has already been introduced but as to which it has made no findings. That testimony in part is:
 
 
 140
 6. Concerning the views of the trustees respecting the import of the word "instrumentality" in 24 P.S. § 2510-202(6), the following testimony is typical:
 
 
 141
 "I do not regard the University as an agency of the State. I consider it purely autonomous. I don't believe the State has any role in any of the personnel practices of the University." (Harbaugh Miller, Esq., former Commonwealth Trustee. Tr. 205).
 
 
 142
 "I do not view the University as an agency of the State, nor do I view the State as having any role in dealing with the management of the University. I view this as the prerogative of the Board of Trustees, and the Chancellor who is appointed by that Board of Trustees." (Alexandria W. Chauss, Alumni Trustee. Tr. 160).
 
 
 143
 "I think we look on our relationship with the State as a contractor for services to the State for which the University is compensated and for which the University has some responsibility or has let me correct that has responsibility for accounting to the State for state funds, as would any contractor." (William H. Rea, Charter Trustee, Chairman of the Board of Trustees, member of the State Board of Education, Chairman of the State Council of Higher Education. Deposition 20).
 
 
 144
 "Well, I have always considered that relationship both as Chancellor of the University and as the Secretary of Education, that the University is primarily a private institution, with a relationship to the State under which they agreed to meet certain requirements as far as giving Pennsylvania residents, for example, for admission, and having State representation on the Board of Trustees. . . . (T)he instrumentality is that, as I interpret it, it is a commitment that the University has made to perform certain services for the State." (Dr. David H. Kurtzman, former Pitt Chancellor and Commonwealth Secretary of Education. Tr. 46).
 
 
 145
 Dr. Kurtzman further testified that the Commonwealth does not exercise any control over the hiring, promotion, tenure, or firing of either faculty members or other personnel. (Kurtzman, Tr. 48-49, 63-64). Similarly, Warren E. Ringler, Commonwealth Deputy Commissioner for Higher Education, testified that the Department of Education does not review individual Pitt faculty appointments. (Ringler, Deposition 77; Tr. 22).
 
 
 146
 It is evident to me that on remand the district court will be hard pressed to find state involvement if limited to the testimony taken to date[21] which of course it will not be. The testimony to date may be supplemented or possibly contradicted. But at least on this record with the showing heretofore made by the defendants, it would appear unlikely that the required state involvement can be found thus revealing the wisdom of making no state action determination until the entire record is closed.
 
 
 147
 I must therefore agree that the district court did not err when, on this record and at this stage of the proceeding, it denied Pitt's motion for summary judgment.
 
 
 
 [1]
 See 28 U.S.C. § 1292(b), which provides in pertinent part:
 When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . .
 The process by which a district judge acts to initiate a § 1292(b) appeal is generally referred to as "certification," a term that we shall use throughout this opinion. See, e. g., 7B Moore's Federal Practice, ch. 83 (1976); Note, Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b), Harv.L.Rev. (1975).
 
 
 [2]
 42 U.S.C. § 1983 (1974)
 
 
 [3]
 A motion for class certification is still pending
 
 
 [4]
 See 343 F.Supp. 836 (W.D.Pa.1972)
 
 
 [5]
 See 477 F.2d 1 (3d Cir. 1973)
 
 
 [6]
 Defendants' motion to dismiss the claims based on 42 U.S.C. § 1981, and Executive Order No. 11246, as amended, was again granted, and no appeal was taken from these dismissals
 The claim under the Pennsylvania Equal Pay Law, Pa.Stat.Ann. tit. 43 § 336.2 et seq. (Purdon Supp.1976), was retained under pendent federal jurisdiction, since the district judge had held an independent basis of federal jurisdiction existed. See Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).
 
 
 [7]
 The opinion of the district court from which this appeal is taken is reported at 392 F.Supp. 118 (W.D.Pa.1975)
 
 
 [8]
 Fed.R.App.P. 5 provides, in pertinent part:
 (a)Petition for Permission to Appeal. An appeal from an interlocutory order containing the statement prescribed by 28 U.S.C. § 1292(b) may be sought by filing a petition for permission to appeal with the clerk of the court of appeals within 10 days after the entry of such order in the district court with proof of service on all other parties to the action in the district court. An order may be amended to include the prescribed statement at any time, and permission to appeal may be sought within 10 days after entry of the order as amended.
 
 
 [9]
 Fed.R.Civ.P. 77(d) provides, in pertinent part:
 "Immediately upon the entry of an order of judgment the clerk shall serve a notice of the entry by mail in the manner provided for in Rule 5 upon each party . . . ."
 
 
 [10]
 Fed.R.App.P. 26(b) provides, in pertinent part:
 "(T)he court may not enlarge the time for filing a notice of appeal, a petition for allowance, or a petition for permission to appeal."
 
 
 [11]
 See, e. g., Hanson v. Hunt Oil Co., 488 F.2d 70 (8th Cir. 1973); Alabama Labor Council, P.E.U., Loc. No. 1279 v. State of Alabama, 453 F.2d 922 (5th Cir. 1972); Borskey v. American Pad & Textile Co., 296 F.2d 894 (5th Cir. 1961)
 
 
 [12]
 Although 28 U.S.C. § 2107 (1971) provides that the district court may extend the time for appeal for thirty days beyond the prescribed period "upon a showing of excusable neglect based on failure of a party to learn of the entry of the judgment, order or decree," we assume that provision has been superseded by Fed.R.App.P. 4(a) under 28 U.S.C. § 2072 (1971). See 9 Moore's Federal Practice P 204.07 at 916-17
 
 
 [13]
 See 9 Moore's Federal Practice P 205.03(2) at 1107 (1975)
 
 
 [14]
 515 F.2d 94, 95 (1st Cir. 1975)
 
 
 [15]
 441 F.2d 407 (6th Cir. 1971) (per curiam)
 
 
 [16]
 366 F.Supp. 1221 (S.D.N.Y.1973)
 
 
 [17]
 Cf. Borskey v. American Pad & Textile Co., 296 F.2d 894, 895 (5th Cir. 1961)
 
 
 [18]
 260 F.2d 431 (3d Cir. 1958)
 
 
 [19]
 Notes of Advisory Committee on Appellate Rule 5, quoted in 9 Moore's Federal Practice P 205.02(2), at 1103 (1975). See 9 Moore's Federal Practice P 205.03(2) at 1106 (1975)
 
 
 [20]
 28 U.S.C. § 1292(b), the text of which is set forth in note 1 supra
 
 
 [21]
 See Note, Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b), 88 Harv.L.Rev. 607, 616 (1975)
 
 
 [22]
 320 U.S. 520, 64 S.Ct. 334, 88 L.Ed. 283 (1944)
 
 
 [23]
 Id. at 523, 64 S.Ct. at 336
 
 
 [24]
 See Notes of Advisory Committee on Rule 77(d), quoted in 7 Moore's Federal Practice, P 77.01(4), at 77-9 (1975); 9 Moore's Federal Practice, P 204.13(1) at 968 (1975); Lieberman v. Gulf Oil Corp., 315 F.2d 403, 405-06 (2d Cir.), cert. denied, 375 U.S. 823, 84 S.Ct. 62, 11 L.Ed. 56 (1963)
 
 
 [25]
 Notes of Advisory Committee on Rule 73, quoted in 9 Moore's Federal Practice P 203.25(1) at 779 (1975)
 
 
 [26]
 Id
 Rule 73, along with Rules 72, 74-76, was abrogated on Dec. 4, 1967 (effective July 1, 1968). These rules were superseded by the Federal Rules of Appellate Procedure.
 
 
 [27]
 Wright, The Interlocutory Appeals Act of 1958, 23 F.R.D. 199, 209 (1959)
 
 
 [28]
 Fed.R.Civ.P. 60(b) authorizes relief from a final judgment or order for, inter alia, "mistake, inadvertence, surprise, or excusable neglect" (60(b) (1)) and "any reason justifying relief" (60(b)(6))
 
 
 [29]
 Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institute, 163 U.S.App.D.C. 140, 500 F.2d 808 (1974); Smith v. Jackson Tool & Die, 426 F.2d 5 (5th Cir. 1970); Cavalliotis v. Salomon, 357 F.2d 157 (2d Cir. 1966); Radack v. Norwegian America Line Agency, 318 F.2d 538 (2d Cir. 1963). See generally 11 Wright & Miller, Federal Practice and Procedure § 2864, at 214-15 (1973)
 
 
 [30]
 Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc., 523 F.2d 744 (5th Cir. 1975), cert. denied, 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976). But see 6A Moore's Federal Practice P 60.03(9) at 4039 (1975), wherein Professor Moore indicates that the failure of the district court may not be enough, standing alone, to justify such use of Rule 60(b)
 Compare Wagner v. United States, 316 F.2d 871 (2d Cir. 1963), and Hodgson v. United Mine Workers, 153 U.S.App.D.C. 407, 473 F.2d 118, 124-25, (1972), with Radack v. Norwegian America Line Agency, 318 F.2d 538 (2d Cir. 1963) and Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institute.
 
 
 [31]
 320 U.S. at 524, 64 S.Ct. at 336
 
 
 [32]
 John Simmons Co. v. Grier Brothers Co., 258 U.S. 82, 88, 42 S.Ct. 196, 66 L.Ed. 475 (1922); United States v. Jerry, 487 F.2d 600, 605 (3d Cir. 1973); Bon Air Hotel, Inc. v. Time Inc., 426 F.2d 858, 862 (5th Cir. 1970); Bucy v. Nevada Construction Co., 125 F.2d 213, 217 (9th Cir. 1942)
 
 
 [33]
 42 U.S.C. § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [34]
 The requirement that actions challenged under section 1983 be taken "under color of" state law has been treated as the equivalent of the element of "state action" essential under the fourteenth amendment. Adickes v. S. H. Kress & Co., 398 U.S. 144, 152 n.7, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); United States v. Price, 383 U.S. 787, 794 n.7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); Gibbs v. Titelman, 502 F.2d 1107 (3d Cir. 1974); Shirley v. State Nat'l Bank of Connecticut, 493 F.2d 739 (2d Cir.), cert. denied, 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974); Green v. Dumke, 480 F.2d 624 (9th Cir. 1973)
 
 
 [35]
 See, e. g., Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); 5 C. Wright and A. Miller, Federal Practice and Procedure § 1357 (1973) and cases cited therein. And, even if Pitt's motion to dismiss the complaint may be treated, pursuant to Fed.R.Civ.P. 12(b), as a motion for summary judgment, such motion also should be viewed in the light most favorable to Dr. Braden, the non-moving party. See, e. g., C. Wright and A. Miller, Federal Practice and Procedure §§ 2725, 2727 (1973) and cases cited therein
 As a further point, we recognize that certain language in the opinion of the district judge seems to indicate affirmatively that state action exists. See 392 F.Supp. at 125-26. However, such statements necessarily must be construed as speaking only to the limited subject at hand the denial of Pitt's motion to dismiss the complaint.
 
 
 [36]
 Other courts have been cognizant of the ramifications of decisions involving the subject of state action. In Berrios v. Inter American University, 535 F.2d 1330, 1333 (1st Cir. 1976), for example, the court stated: "we approach with some caution any labelling that might incidentally contribute to the erosion of the autonomy and diversity of private colleges and universities."
 The Berrios court, it should be noted, sustained a dismissal of a complaint in § 1983 action, after determining that the record failed to disclose that the educational enterprise was "so closely associated with the Commonwealth as to warrant judicial scrutiny under § 1983."
 
 
 [37]
 See, e. g., Note, State Action: Theories for Applying Constitutional Restrictions to Private Activity, 74 Colum.L.Rev. 654 (1974) (an insightful commentary on the philosophical underpinnings of the state action doctrine as well as the problem of differentiating between state and private action)
 
 
 [38]
 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)
 
 
 [39]
 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)
 
 
 [40]
 365 U.S. at 725, 81 S.Ct. at 862
 
 
 [41]
 419 U.S. at 351, 95 S.Ct. at 453
 
 
 [42]
 See Brief for Appellants at 20-25
 
 
 [43]
 419 U.S. at 357, 95 S.Ct. at 457
 
 
 [44]
 See, e. g., id. at 350, 351, 95 S.Ct. 449
 This Court has, on a number of previous occasions, indicated that Burton is very much a viable precedent. See, e. g., Broderick v. Associated Hospital Service of Philadelphia, 536 F.2d 1, 4 (3d Cir. 1976); Magill v. Avonworth Baseball Conference, 516 F.2d 1328, 1332 (3d Cir. 1975).
 
 
 [45]
 See Hollenbaugh & Philburn v. Carnegie Free Library, 545 F.2d 382 (3d Cir. 1976), a case recently decided. Speaking for a unanimous panel, Judge Aldisert declared: "The state's extensive participation in the comprehensive program may obviate a need to show involvement in the specific activity challenged, (as) is illustrated by Burton . . . ."
 
 
 [46]
 Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), though decided before Jackson, indicates that a bipartite approach to state action is the proper one. In declining to find state action in Moose Lodge, the Court seemingly invoked both the "close nexus" and "overall relationship" formulas:
 However detailed this type of (private club) regulation may be in some particulars, it cannot be said to in any way foster or encourage (the) discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise."
 Id. at 176-77, 92 S.Ct. at 1973.
 The Supreme Court has, of course, fashioned other analytical frameworks to deal with state action problems of a different complexion. See, e. g., Hudgens v. N.L.R.B., 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946).
 
 
 [47]
 365 U.S. at 722, 81 S.Ct. at 860
 
 
 [48]
 419 U.S. at 351, 95 S.Ct. 449
 
 
 [49]
 Pa.Stat.Ann. tit. 24, § 2510-201 et seq. (Purdon Supp.1976)
 
 
 [50]
 See 392 F.Supp. at 122
 
 
 [51]
 State Board of Education, Commonwealth of Pennsylvania, Resolution, March 10, 1966 (Supplemental Appendix at 43aa)
 
 
 [52]
 Transcript of Proceedings, October 29, 1974, at 46 (Appendix at 289a)
 
 
 [53]
 Pa.Stat.Ann. tit. 24, § 2510-202 (Purdon Supp.1976). (emphasis added)
 Both parties have stipulated that, for purposes of 11th Amendment state immunity, the University of Pittsburgh is not to be deemed a state agency. See 392 F.Supp. at 123. However, at oral argument, the Court was advised that such stipulation was not intended to bear on the state action issue.
 
 
 [54]
 Id. at § 2510-203
 
 
 [55]
 Id. at § 2510-203
 
 
 [56]
 Although the hearing revealed no evidence that the Commonwealth trustees had voted as a bloc, see 392 F.Supp. at 121, it still might be possible to infer that the Commonwealth is capable of influencing Board decisions
 Some trustees who are not selected by the Commonwealth nonetheless have positions with the state government. For example, the Chairman of Pitt's Board of Trustees is a member of the State Board of Education and also serves as Chairman of the State Council of Higher Education. Members of both of these state educational bodies are appointed by the Governor.
 It also is worth noting that the Pennsylvania Manual, a publication of the Commonwealth which lists state departments, agencies and boards, categorizes Pitt's Board of Trustees as a subspecies of the Department of Education. Commonwealth of Pennsylvania, Pennsylvania Manual (1974-75) at 331.
 
 
 [57]
 See Pa.Stat.Ann. tit. 24, §§ 2510-206 to 207
 
 
 [58]
 See 392 F.Supp. at 122-23
 In its opinion, the district court listed the annual appropriations for six fiscal years:
 1968-69 $32,003,000.00
1969-70 $37,899,000.00
1970-71 $37,889,000.00
1971-72 $40,556,000.00
1972-73 $45,582,000.00
1973-74 $47,919,000.00
 Of course, the extension of monetary aid to a private institution by a state constitutes only one of the factors that may speak to the question of state action. See, e. g., Hollenbaugh v. Carnegie Free Library, 545 F.2d 382, 385 (3d Cir. 1976); Grossner v. Columbia University, 287 F.Supp. 535, 547-48 (S.D.N.Y.1968).
 
 
 [59]
 See Pa.Stat.Ann. tit. 24, § 2510-207
 It should be pointed out that, aside from the various modes of regulation mandated in the Act, the "entire management, control and conduct of the . . . financial affairs of the university is hereby vested in the board of trustees. . . ." Id. at § 2510-205.
 
 
 [60]
 Although Pitt offered testimony in the district court that the Auditor General reviewed the expenditure of private funds only so as to determine the necessary amount of state appropriations, see Appendix at 101a, the trial judge declined to incorporate such testimony in his findings of fact
 
 
 [61]
 Id. at § 2510-210
 
 
 [62]
 Act of December 6, 1972, No. 69-A, 1972 Pa.Laws 1949 ("Snyder Amendment")
 
 
 [63]
 Pa.Stat.Ann. tit. 24, § 2510-208
 
 
 [64]
 392 F.Supp. at 123
 The record indicates that Dr. Braden worked primarily in Salk Hall during her employment at Pitt, a building apparently owned by the Commonwealth and renovated with G.S.A. funds. See Brief for Appellee at 45. The Supplemental Appendix at 227aa contains an exhibit which specifically lists the renovation of Salk Hall as a G.S.A. project.
 
 
 [65]
 Id. at 122
 
 
 [66]
 See Isaacs v. Board of Trustees of Temple University, 385 F.Supp. 473, 475-77 (E.D.Pa.1974), for the history of the Commonwealth's system of state-related institutions. Isaacs is discussed briefly in Part II D, infra, of this opinion
 
 
 [67]
 See 365 U.S. at 722-24, 81 S.Ct. 856
 
 
 [68]
 419 U.S. at 358, 95 S.Ct. 449
 
 
 [69]
 See text accompanying notes 63-64 and note 64 supra
 
 
 [70]
 Assuming arguendo that Jackson, not Burton, controls the case at bar, there still may be a basis for concluding that sufficient state action exists to comply with the jurisdictional requirements of 42 U.S.C. § 1983. The district court believed that the "close nexus" formula of Jackson might well be satisfied on the facts as proffered. 392 F.Supp. at 125-126. And there is some evidence of state participation in the activity specifically challenged by Dr. Braden to wit, the University's employment policies and practices. In addition to the Snyder Amendment, to which we earlier referred, see text accompanying note 59 supra, the Board of Trustees confronted the issue of sex discrimination when it adopted a Resolution in 1970 proscribing such discrimination at Pitt, see 392 F.Supp. at 122. We already have noted the substantial participation of Commonwealth-appointed representatives on the Board of Trustees, see text accompanying notes 53-54 supra. Arguably, then, the facts tendered in the pleadings and elicited during the evidentiary hearing may fulfill even the "close nexus" test of Jackson
 In any event, at this preliminary stage of the proceedings, involving a motion to dismiss a complaint, an appellate court should be reluctant to declare that the trial judge erred when he ruled that the available facts, even when viewed under the analytical framework of Jackson, did not warrant dismissal of the complaint for a purported lack of state action. See text accompanying note 35 supra. This would appear to be so even though there was some evidence that the Commonwealth had not participated in the hiring or firing of individual faculty members and even though the district court entered no finding on this subject. See 392 F.Supp. at 122. For it is not clear beyond doubt that Dr. Braden will be unable to demonstrate, at trial, that there is some nexus between the Commonwealth and the employment practices that she challenges.
 
 
 [71]
 Isaacs v. Board of Trustees of Temple University, 385 F.Supp. 473 (E.D.Pa.1974); Powe v. Miles, 407 F.2d 73 (2d Cir. 1968)
 
 
 [72]
 385 F.Supp. 473 (E.D.Pa.1974)
 
 
 [73]
 Compare Pa.Stat.Ann. tit. 24, § 2510-1 et seq. ("Temple University-Commonwealth Act") with Pa.Stat.Ann. tit. 24, § 2510-201 et seq. ("University of Pittsburgh-Commonwealth Act")
 The Temple Act was enacted roughly eight months prior to the Pitt statutory program. For the history of the Temple legislation, see 385 F.Supp. at 475-77.
 
 
 [74]
 385 F.Supp. at 495
 
 
 [75]
 407 F.2d 73 (2d Cir. 1968)
 
 
 [76]
 Id. at 82-83
 
 
 [77]
 At the time of the Powe litigation, the State of New York appropriated approximately.$1.8 million for the ceramics school, an amount covering the "direct" expenses and certain other miscellaneous costs of the school. Id. at 76
 
 
 [78]
 Compare N.Y. Education Law § 6101 (McKinney 1976), quoted in 407 F.2d at 75 n.3, 83, with Pa.Stat.Ann. tit. 24, § 2510-201
 The historical origins of the College of Ceramics do, however, differ from those of Pitt. For the college descends from a clay-working school founded by the State of New York at the turn of this century, 407 F.2d at 73.
 
 
 [79]
 For the most part, those cases in which state action has been present concerned state-owned colleges. See, e. g., Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1971) (Central Connecticut State College); Skehan v. Bloomsburg State College, 501 F.2d 31 (3d Cir.), vacated and remanded for further consideration, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975); Brown v. Strickler, 422 F.2d 1000 (6th Cir. 1970) (University of Louisville); Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir. 1969), cert. denied, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970); Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961) (Alabama State College). But see Hammond v. University of Tampa, 344 F.2d 951 (5th Cir. 1965); Belk v. Chancellor of Washington University, 336 F.Supp. 45 (E.D.Mo.1970). Cf. Rackin v. University of Pennsylvania, 386 F.Supp. 992 (E.D.Pa.1974)
 Understandably, most courts have been reluctant to impose constitutional and statutory mandates on private universities which receive limited state benefits. See, e. g., Cannon v. University of Chicago, Nos. 76-1238, 76-1239 (7th Cir. August 27, 1976); Greenya v. George Washington University, 167 U.S.App.D.C. 379, 512 F.2d 556 (1975), cert. denied, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1976); Spark v. Catholic University, 167 U.S.App.D.C. 56, 510 F.2d 1277 (1975) (per curiam); Blouin v. Loyola University, 506 F.2d 20 (5th Cir. 1975) (per curiam); Wahba v. New York University, 492 F.2d 96 (2d Cir.), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); Grafton v. Brooklyn Law School, 478 F.2d 1137 (2d Cir. 1973); Blackburn v. Fisk University, 443 F.2d 121 (6th Cir. 1971); Browns v. Mitchell, 409 F.2d 593 (10th Cir. 1969); Pendrell v. Chatham College, 370 F.Supp. 494 (W.D.Pa.1974); Furumoto v. Lyman, 362 F.Supp. 1267 (N.D.Cal.1973); Brownley v. Gettysburg College, 338 F.Supp. 725 (M.D.Pa.1972); Rowe v. Chandler, 332 F.Supp. 336 (D.Kan.1971); Story v. Tate, 382 F.Supp. 1078 (N.D.Tex.1971); McLeod v. College of Artesia, 312 F.Supp. 498 (D.N.M.1970); Counts v. Voorhees College, 312 F.Supp. 598 (D.S.C.1970), aff'd mem. 439 F.2d 773 (4th Cir. 1971); Torres v. Puerto Rico Junior College, 298 F.Supp. 458 (D.P.R.1969); Grossner v. Trustees of Columbia University, 287 F.Supp. 535 (S.D.N.Y.1968); Guillory v. Administrators of Tulane University, 212 F.Supp. 674 (E.D.La.1962).
 
 
 [80]
 524 F.2d 818 (7th Cir. 1975)
 
 
 [81]
 See id. at 823-24
 
 
 [82]
 Id. at 825
 
 
 [83]
 Id. at 824-25
 
 
 [84]
 See, e. g., id. at 827
 
 
 [85]
 Id. at 825
 
 
 [1]
 10 C. Wright and A. Miller, Federal Practice and Procedure § 2725 at 510 (1973)
 
 
 [2]
 E. g., Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Broderick v. Associated Hospital Service of Philadelphia, 536 F.2d 1 (3d Cir. 1976)
 
 
 [3]
 The essence of the trustees' testimony was that in practice Pa.Stat.Ann. Tit. 24, § 2510-202 (Supp.1976) did not convert Pitt into an agency of the state; that the statute did not give the Commonwealth any role in the management of the University or in its personnel policies; and that the provision's true meaning was simply to make Pitt "a contractor for services to the State for which the University is compensated." 392 F.Supp. at 121-22
 
 
 [4]
 In Braden I, this Court was aware of Pa.Stat.Ann. Tit. 24, § 2510-202 (Supp.1976). Nevertheless, we remanded because we felt that "the views of the trustees respecting this unusual provision, i. e., how they interpret it might be of great value in resolving the difficult issue presented." Id. at 7. We believed, in other words, that the interpretation placed upon this provision by the persons who govern the University ought to be considered in ascertaining the statute's practical effect
 
 
 [5]
 The opinion of the Court relies to some extent upon the fact that the Governor, the Mayor of Pittsburgh, and the Secretary of Education of the Commonwealth are ex officio members of Pitt's Board of Trustees. I am not sure that that reliance is justified even at this stage of the proceedings. The record shows that these officials very rarely attended trustees' meetings. Appendix at 314a, 445a-46a. More important, it is a very old and very common practice for private universities to make one or two high state officials ex officio trustees. As Braden I noted, the distinction between public and private educational institutions under American law dates from Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). 477 F.2d at 6. See generally Friendly, The Dartmouth College Case and the Public Private Penumbra, 12 Texas L.Q. 9 (1969). It is therefore interesting to note that the original charter granted to Dartmouth College in 1769 by King George III named as trustees the colonial governor and several other New Hampshire officials. 17 U.S. (4 Wheat.) at 523-24
 
 
 [6]
 Of the 16 Commonwealth appointees who served between 1966 and 1976, six were corporate executives, one was general counsel to the United Steel Workers, four were privately employed professionals, one was a retired state judge, one was an active state judge, and three were members of the legislature. Supp.App. at 144a. This group is demographically quite similar to the group of trustees elected by the Board. For example, the 11 persons chosen as term trustees during the same period included four corporate executives, one lawyer in private practice, one doctor, the president of a private college, one judge, one Congressman, and one retired governor. Id. at 144aa-45aa
 
 
 [7]
 It would appear to me that on remand the district court should compare the statute which authorizes the Commonwealth to appoint one-third of the members of Pitt's Board of Trustees with several provisions in the By-Laws of Blue Cross of Greater Philadelphia which were called to our attention in Broderick v. Associated Hospital Service of Philadelphia, 536 F.2d 1 (3d Cir. 1976). Under those by-laws, various Pennsylvania public officials are empowered to nominate seven of the 34 members of the Board of Directors of Blue Cross of Greater Philadelphia. By-Laws of Blue Cross of Greater Philadelphia § 3.04(a). In addition, the by-laws require under the usual circumstances that at least two of the seven members of the organization's executive committee be nominated by public officials. Id. at § 3.17(a). The executive committee is empowered to "exercise all of the powers and authority of the Board of Directors" with a few exceptions. Id. at § 3.17(b). All of these provisions were called to the Court's attention in Broderick. Brief for Amicus Curiae American Civil Liberties Foundation of Pennsylvania in Broderick v. Associated Hospital Service of Philadelphia at exhibit A at 5. Nevertheless, tested against the requirements of Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), we found them insufficient to show the presence of state action. Broderick v. Associated Hospital Service of Philadelphia, supra, at 4 n.15
 
 
 [8]
 In my view, the district court on remand should compare the Commonwealth's authority to audit Pitt with its extensive authority to audit Blue Cross (Pa.Stat.Ann., tit. 40, § 6125(b) (Supp.1976)) and public utilities such as the Metropolitan Edison Company (Pa.Stat.Ann., tit. 66, §§ 1211-18 (1959)). In Broderick and in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), aff'g. 483 F.2d 754 (3d Cir. 1973), neither this Court nor the Supreme Court felt that the Commonwealth's authority to audit the private entities indicated the presence of state action
 
 
 [9]
 It would appear to me that on remand the district court will have to compare these requirements with the detailed reporting requirements which Pennsylvania law imposes upon Blue Cross. Pa.Stat.Ann., tit. 40, § 6125(a) (Supp.1976). See Broderick v. Associated Hospital Service of Philadelphia, supra
 
 
 [10]
 Without these two salutary principles, federal courts would soon be drawn into a morass. First, courts would inevitably be required to determine precisely how much state aid is permitted before state action can be found. The District of Columbia Circuit has already held that governmental aid totalling approximately 25 per cent of a private university's budget is not by itself enough to implicate the government in the actions of the institution. Spark v. Catholic Univ. of America, 167 U.S.App.D.C. 56, 510 F.2d 1277 (1975). If Pennsylvania's annual aid to Pitt approximately 35 per cent of the University's operating budget is viewed as strong evidence of state action, that holding together with Spark would establish the maximum amount of aid permitted at somewhere between 25 and 35 per cent. It would not be long before courts would be required to determine the precise percentage where the critical line would be drawn
 Second, if the percentage of an institution's budget contributed by the government were to be accorded that significance, courts would soon be required to scrutinize the institution's financial affairs in order to ascertain the relevant figures for each relevant category. Courts would be required to decide whether to focus upon an institution's operating budget, its capital grants, or its "hard core" budget, see Rackin v. Univ. of Pa., 386 F.Supp. 992, 996-97 (E.D.Pa.1974), and whether to include state aid given directly to students or their parents as part of their calculations. Cf. Comm. for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (granting tuition reimbursements and tax benefits to parents of students attending church-related schools implicates the state in the religious activities of those schools). For a description of state aid to college students and the benefits such aid provides for private colleges, see Carnegie Commission on Higher Education, Higher Education: who pays? who benefits? who should pay? 183-85 (1973); O'Neil, Private Universities and Public Law, 19 Buffalo L.Rev. 155, 174-75 (1970).
 Finally, while this case concerns state aid, significant reliance upon that assistance at the final judgment stage would raise serious questions with respect to the federal government's massive payments to major private universities. For a number of years, those payments have averaged more than 40 per cent of the annual budgets of the recipient institutions. W. Bowen, The Economics of the Major Private Universities 35 (1968). See also Grossner v. Trustees of Columbia Univ., supra at 547 n.17 (federal aid totalled approximately 42 per cent of budget for fiscal year 1967). Federal assistance, of course, is not evidence of action "under color of" state law and would not be relevant in an action under 42 U.S.C. § 1983. But sufficient federal involvement in private activity which violates constitutional rights forms the basis for a claim against the private entity for equitable relief and possibly for money damages. Greenya v. George Washington Univ., 167 U.S.App.D.C. 379, 512 F.2d 556, 562-63 n.13 (1975); Spark v. Catholic Univ. of America, 167 U.S.App.D.C. 56, 510 F.2d 1277 (1975).
 
 
 [11]
 Maj.Op. at 957. The sentence in Burton stated:
 The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.
 365 U.S. at 725, 81 S.Ct. at 862. This sentence is hardly an unambiguous adoption of the overall relationship test. While the phrase "insinuated itself into a position of interdependence" may suggest that approach, the phrase "joint participant in the challenged activity" equally may be read as the "nexus" test.
 
 
 [12]
 The Court does acknowledge at one point that Jackson may have greatly limited Burton's scope:
 In Jackson, the Supreme Court suggested that the "actual holding" of Burton might be limited to lessees of public property. Even so, as previously indicated, many of the buildings within the Pitt complex were built by the state or its agencies with public funds and are leased to the University, including the very building within which Dr. Braden worked. It follows that even if Burton and its "relationship" theory of state action should be limited to a "lease" situation, the present appeal still may be governed by the teachings of that landmark decision.
 Maj.Op. at 962. This passage is cross-referenced to footnote 64, which states in relevant part:
 The record indicates that Dr. Braden worked primarily in Salk Hall during her employment at Pitt, a building apparently owned by the Commonwealth and renovated with G.S.A. funds. See Brief for Appellee at 45. The Supplemental Appendix at 227aa contains an exhibit which specifically lists the renovation of Salk Hall as a G.S.A. project.
 Maj.Op. at 961 n.64.
 Despite these statements in the opinion of the Court, the portions of the record which have been brought to our attention show only that a renovation of Salk Hall was begun in 1961 five years before the enactment of the Pittsburgh-Commonwealth Act. Supplemental Appendix at 227aa. These facts would seem to cast some doubt upon the ability of Dr. Braden to prevail on the issue of state action if Burton is limited to "lease" situations.
 
 
 [13]
 Supreme Court opinions announced prior to Moose Lodge do not discuss Burton in any detail and do not suggest that Burton adopted an "overall relationship" approach
 
 
 [14]
 In Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (holding that broadcasters are not required to accept paid editorial advertisements), Chief Justice Burger, joined by two other members of the Court, concluded that a broadcast licensee's refusal to accept editorial advertisements was not state action. The Chief Justice wrote:
 In dealing with the broadcast media, as in other contexts, the line between private conduct and governmental action cannot be defined by reference to any general formula unrelated to particular exercises of governmental authority. When governmental action is alleged there must be cautious analysis of the quality and degree of Government relationship to the particular acts in question. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). (Emphasis added.)
 Id. at 115, 93 S.Ct. at 2093.
 
 
 [15]
 The opinion reveals that 11 of the trustees were government officials, but it does not indicate the total number of trustees in office at that time. A total of 24 trustees was authorized, but there were at least four vacancies. Hollenbaugh v. Carnegie Free Library, supra, at 384
 
 
 [16]
 Powe v. Miles, supra, at 81
 
 
 [17]
 In addition, New York State paid Alfred a fixed amount per credit hour for courses which ceramics students took in one of the University's private branches. 407 F.2d at 76. The state also reimbursed Alfred for the ceramics school's pro rata share of the University's overall administrative expenses. Id. Thus, New York's funding of the New York State College of Ceramics was of the same character and as extensive as the public funding of the library involved in Hollenbaugh v. Carnegie Free Library, supra, which is discussed above
 
 
 [18]
 Powe v. Miles, supra, at 75
 
 
 [19]
 New York Education Law § 6101 (McKinney 1972)
 
 
 [20]
 Pa.Stat.Ann. Tit. 24, § 2510-202 (Supp.1976)
 
 
 [21]
 In upholding the district court's dismissal of Pitt's motion, the majority relies almost exclusively on Pennsylvania's legislative enactments, ignoring almost wholly the testimony and evidence introduced at the hearing which we ordered in Braden I. As I have observed, however, these statutes had been enacted and were in force long before Braden I
 I believe as the panel in Braden I obviously believed, that a good deal more than mere reference to the Commonwealth's statutes will be required to determine the existence of the necessary "nexus" and other mandated factors for a finding of state action. Doubtlessly the Braden I panel had in mind the determination of this issue on a final record with evidence and testimony fleshing out the legislative intent, and with findings of fact made by the district court. (It could not have believed otherwise for, as we have noted, the statutes in issue were the same both before and since Braden I ). This circumstance, if no other, bolsters my views which are expressed here that the state action issue posed by this case should not be made on less than a complete record and certainly not on a naked reading of inconclusive statutory enactments with no factual context on which findings of the court can be predicated.