Edgar H. ELY, Jr., Appellant,

v.

HALL'S MOTOR TRANSIT COMPANY and Teamsters Local Union No. 429, an Affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Appellees.

No. 78–1524.

United States Court of Appeals,
Third Circuit.

Argued Nov. 13, 1978.
Decided Dec. 12, 1978.

William T. Adis, Pechner, Dorfman, Wolffe, Rounick & Cabot, Philadelphia, Pa., for appellant.

James A. Matthews, Francis M. Milone, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee Hall's Motor Transit Co.

Edward Davis, Philadelphia, Pa., for appellee Teamsters Local No. 429; Clarence C. Mendelsohn, Reading, Pa., co-counsel.

Before ROSENN, GARTH and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

The narrow issue that we are asked to decide on this appeal is whether summary judgment was properly granted by the district court in favor of Hall's Motor Transit Company ("Hall") and Teamsters Local Union No. 429 ("Union"). Hall and the Union were sued by Edgar H. Ely, Jr., a former employee of Hall's and a member of the Union, pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1977), on the ground that Hall had breached the applicable collective bargaining agreement and that the Union had breached the duty of fair representation that it owed to Ely.

Upon review of the record, we are of the opinion that a narrow range of material factual issues remains in dispute among the parties. We therefore conclude that summary judgment should not have been granted.

### I

Ely was employed by Hall's from March, 1965 to January, 1975 at its terminal in Kutztown, Pennsylvania. During this time, he worked at several different positions. From March 12, 1965 to July 12, 1971 Ely worked as a dockman and a hostler.[1] Since July 12, 1971 he has worked primarily as a city run driver[2] or a peddle run driver.[3] During the time that Ely worked as a driver, he was assigned to the "extra board" at Hall's terminal. "Extra board" employees were not assigned permanently to a specific position and were not guaranteed any spe-

---

1. A hostler moves trucks and cabs within the terminal area.

2. City run drivers operate within a radius of eighteen miles of the terminal.

3. Peddle run drivers operate within a radius between eighteen miles and one hundred miles of the terminal.

cific number of hours of employment per week. At the time of Ely's employment, they did however, have the privilege of selecting in advance the type of work that they desired to do.[4] They could choose among road work[5], city run work, peddle run work, or dock work, and were entitled to decline work offered to them in categories they had not selected. While working on the "extra board", Ely signed up only for dock work, city run work, and peddle run work; he consistently declined road work that was offered to him.

At all relevant times, Hall and the Union were parties to the National Master Freight Agreement and Central Pennsylvania Over-the-Road and Local Cartage Supplemental Agreement (NMFA). Section 2(a) of Article 42 of the NMFA specifies the conditions under which seniority will be broken:

> Seniority shall be broken only by discharge, voluntary quit, layoff for a period of three (3) years from last date of employment, failure to respond to notice of recall, or unauthorized leave of absence.

Article 43 sets forth the grievance and arbitration procedure "for the purpose of settling grievances and disputes." A Joint Local City Grievance Committee ("City Committee"), composed of two representatives of the Union and two representatives of the employer, was established for the purpose of hearing and deciding grievances. If a decision is not reached or a settlement agreed upon, the grievance is referred to the Central Pennsylvania Joint Area Grievance Committee ("Area Committee"). Any decision reached by the Area Committee is final and binding on the parties. If no decision is reached, the matter proceeds to arbitration.

Grievances initiated by employees under the NMFA must be submitted in writing to the Union representative or steward within three days from the occurrence of the matter.[6] Union initiated grievances must be submitted in writing to the employer within seven days from the date of the occurrence of the matter.

On January 11, 1975, Ely was laid off by Hall because of lack of work. Ely received a telephone call from James Collins, manager of Hall's Kutztown terminal, on March 26, 1976. This call was described by Ely as follows:

> He [Collins] had called me up and asked if I was interested in a road bid, in which I replied, "No, I don't think so because I never had road experience."

App. 33a.

The next day, March 27, Ely received a letter from Collins which read as follows:

> This letter will confirm our conversation this date. That due to the fact that you are unable to return to work, your name shall be removed from the seniority list, under the provisions of Article # 42, Section # 2 (failure to respond to a notice of re-call).

App. 123a.

Ely communicated with Gus Varish, a business agent for the Union, immediately after receiving the letter. Varish informed Ely that he should take the letter to Collins so that Collins could explain its meaning. Ely visited Collins on March 29, 1976, and was informed that the letter meant that Ely's name would go to the bottom of the

---

**4.** This selection privilege was apparently ended as of April 3, 1977. Employees on the "extra board" must now accept whatever type of work is offered to them.

**5.** Over-the-road drivers drive on routes extending beyond a one hundred mile radius of the terminal.

**6.** NMFA, Art. 5, § 6 requires Hall to post a seniority list at least once every twelve months. Employees must make written complaints concerning the seniority list to both Hall and the Union within 30 days after posting. Ely relied on this provision in the district court in con-

tending that his grievance in this case was timely filed. Hall took the position that Ely's grievance related to the recall notice, not his position on the seniority list, and that his grievance was untimely because it was not filed within three days of either the March 27 recall or the June 1 posting of the seniority list. The district court, because it concluded that Hall did not breach the collective bargaining agreement, did not pass upon this issue. Neither Hall nor the Union urge the untimeliness point upon this court, and we also decline to rule upon it.

seniority list. Following this meeting, Ely again spoke to Varish. Varish apparently told Ely that the road job which Ely had been offered would have to be posted for bid, and that if someone bid for the job, "that would let him [Ely] off the hook."[7] Bids were in fact posted, and two employees signed for the bids. When Ely discovered that the bids had been posted and signed, he did not file a grievance or engage in any further discussions with Collins.

On June 1, 1976, a new seniority list was posted at the Kutztown terminal. Ely discovered on or about that date that his name was not posted on the list. He again spoke to business agent Varish. Despite Varish's protestations that he had previously informed Ely to accept the recall, Varish stated that he would try to set up a meeting with Collins to resolve the problem. Ely then submitted a written grievance to the Union on June 7, 1976.

Two settlement meetings were held between representatives of Hall and the Union, but they were not successful in resolving the grievance. Local Union officials were apparently disinclined to proceed further with the grievance, but it was submitted to the City Committee for resolution after Ely wrote in protest to the International Brotherhood of Teamsters. This Committee, however, deadlocked. The grievance was then submitted to the Area Committee, but only after Ely again wrote to the International to protest the unwillingness of Local officials to proceed further. The Area Committee denied Ely's grievance, and pursuant to the terms of the NMFA, this became a final decision binding on the parties. Ely then commenced this lawsuit after unsuccessfully filing an unfair

labor practice charge with the National Labor Relations Board.

## II

 Section 301 authorizes suits to be brought in federal district court pertaining to violations of collective bargaining agreements.[8] This authorization includes suits by and against individual employees as well as the more traditional legal contests between employer and union. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 562, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Smith v. Evening News Association,* 371 U.S. 195, 198–200, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). The provision of a judicial forum for resolving contractual disputes was not intended, however, to undermine the importance or effectiveness of the grievance procedures typically contained in collective bargaining agreements. These procedures are themselves subject to enforcement in a section 301 action. It has also been recognized that the union, which has been vested with the power inherent in its status as exclusive bargaining representative, *see Steele v. Louisville N. R. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), might not represent fairly in the grievance process the contractual rights of an individual employee. In order to vindicate an employee's claim against his employer even though a decision adverse to the employee has been rendered as a result of the grievance process, an action under § 301 is available if the employee can demonstrate that the union, in processing the grievance, had breached the duty of fair representation which it owed to the employee. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 568–72, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).[9] *See*

---

7. The Union was incorrect in this advice. Article 55 of the NMFA provides that "[a]ll regular jobs shall be posted for bids by the Employer", and defines "regular jobs" as "[a]ny new job created and operated for a period of thirty (30) days." The job offered to Ely was not a regular job since it had not been created and operated for thirty days; therefore, Hall was not required to post it for bids.

8. Section 301(a) provides:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

9. In *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. at 570–71, 96 S.Ct. at 1059, the Supreme

*Vaca v. Sipes,* 386 U.S. 171, 183–88, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

In this case, the district court did not decide whether the Union had breached its duty of fair representation.[10] It went no further than to determine that Hall had not breached the collective bargaining agreement. Reasoning that Ely had received a notice of recall and that he had failed to respond, the district court concluded that Hall was justified in moving Ely to the bottom of the seniority list. Summary judgment was granted in favor of both Hall and the Union on this basis.

### III

### A

■ Summary judgment may be properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Proc. 56(c). In construing this Rule, this court has repeatedly stated that "summary judgment is never warranted except on a clear showing that no genuine issue of any material fact remains for trial . . . ." *Suchomajcz v. Hummel Chemical Company,* 524 F.2d 19,

24 (3d Cir. 1975). *See First Pennsylvania Banking and Trust Company v. United States Life Insurance Company,* 421 F.2d 959, 962 (3d Cir. 1969). Moreover, the existence of disputed issues of material fact should be ascertained by resolving "all inferences, doubts and issues of credibility against the moving party." *Smith v. Pittsburgh Gage and Supply Company,* 464 F.2d 870, 874 (3d Cir. 1972). *See Braden v. University of Pittsburgh,* 552 F.2d 948, 954 n.35 (3d Cir. 1977) (en banc); *Id.* at 966–67 (Garth, J., concurring).

### B

The award of summary judgment in this case was hinged on the determination that Ely had received a valid notice of recall and had failed to respond. Based on our analysis of the record, however, it is just this determination which we believe raises genuine issues as to material facts. Acknowledging the facts as Ely has alleged them, *see Smith v. Pittsburgh Gage and Supply Company, supra,* the phone call that he received on March 26, 1976 is ambiguous as to whether it amounted to a notice of recall. Collins inquired of Ely only whether he was "interested" in a road job; Collins did not characterize this inquiry as a notice of recall.[11] Based on the ambiguity of this tele-

---

Court described the burden on an employee in a section 301 suit as follows:

"To prevail against either the company or the Union, [the employees] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union."

**10.** Hall and the Union argue before this court that the district court's decision should be affirmed on the alternate ground that the undisputed facts demonstrate that the Union did not, as a matter of law, breach its duty of fair representation. The contours of this duty are set forth in *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Goclowski v. Penn Central Transportation Co.,* 571 F.2d 747 (3d Cir. 1977); *Bazarte v. United Transportation Union,* 429 F.2d 868 (3d Cir. 1970). We think, however, that it would be inappropriate to rule on this issue at this time. There is apparently a disputed factual issue as to whether officials of the Union investigated Ely's grievance in

sufficient detail to enable them to process the grievance in more than a perfunctory manner. *See* Plaintiff's Answers to Hall's Interrogatories, Answer No. 13. Moreover, the district court made no findings as to the Union's good faith or bad faith in processing the grievance. Also, there appears to be an unresolved issue as to whether Ely ratified the Union's processing of the grievance or made a voluntary, knowing, and intelligent waiver of the Union's duty owed to him by answering affirmatively to an Area Committee arbitrator's question as to whether the local union had properly represented him in processing the grievance. App. 103a–04a. If necessary to the disposition of this action, these determinations should be made by the district court on remand.

**11.** Ely was firm in his position that Collins' "exact words" were whether Ely was "interested in" a road bid. App. 33a.

Collins, in contrast, stated in deposition testimony that he had fully informed Ely during their phone conversation that he was being

phone conversation, the past practice of Hall with respect to "extra board" drivers,[12] and Ely's subsequent actions, there clearly appears to be a disputed issue of fact as to whether Ely understood the telephone conversation as a notice of recall.[13]

The district court thought that it was unnecessary to resolve this contested factual issue because subsequent events clarified the meaning of the phone conversation. This reasoning was explained as follows:

"However, even under the plaintiff's version of the events, plaintiff knew by March 27, the day he received written notice of his removal from the seniority list from Mr. Collins, that the company considered the conversation with Mr. Collins to be an official recall. Further, when he discussed the letter with Mr. Collins a few days later, he was again informed he had lost his seniority because of his refusal to take the road job. Thus, there is no question that the plaintiff knew that this was a recall and yet he failed to respond."

Bench Opinion, App. 258a.

 It is at this point, however, that the district court's opinion blurs two discrete issues: (1) whether the meaning of the March 26 telephone conversation was sufficiently clarified by the later explanations of Collins so that Ely understood, after receiving these explanations, that he was being given a notice of recall, and (2) whether Ely was afforded an opportunity to comply with the recall once it was established by Collins' explanations that a recall notice had in fact been given. Based on the March 27 letter from Collins and Ely's subsequent conversation with Collins, it appears undisputed that Ely understood that Hall's position was that the March 26 phone conversation had constituted a notice of recall. However, what this record does not contain, and what is obviously required but inappropriate in a summary judgment context, are findings of fact by the district court establishing (1) whether the March 26 telephone call was the equivalent of a notice of recall and was so understood by Ely, and (2) if it was not, whether Ely was presented with an opportunity to respond to the recall after Collins' explanations made it apparent that a recall notice had in fact been issued.[14] From our reading of the record, it is likely that the March 27 letter and later conversation with Collins did no more than present Ely with a *fait accompli* —i. e., that the March 26 phone call had, in Collins' view, constituted a notice of recall; that Ely had failed to respond to that notice; and that his name would therefore be dropped to the bottom of the seniority list. Although the issue is not now directly be-

---

recalled and of the consequences of his failure to respond:

I explained to him that you can't tell the company, once you are on layoff, how you want to work. We have work for you. You have to come back to work or I will have to send you a letter that your name will be removed from the seniority list.
App. 171a.

**12.** Since Ely had been entitled in the past to turn down "extra board" assignments not of his choosing, it is not implausible to infer that Ely thought he could turn down such a casual offer of a road job without penalty.

**13.** Appellee Union refers us to Pennsylvania State Court decisions holding that the disclosure of information sufficient to create a duty of inquiry amounts to notice. Brief for Appellee Union at 5–6. Of course, in this section 301 action it is federal law, and not state law, that governs. *Textile Workers Union v. Lincoln Mills of Alabama,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). In this case, we do not

think Collins' telephone call alone would constitute a valid notice of recall unless it is established that Ely understood it as an official notice of recall pursuant to the collective bargaining agreement.

**14.** In deposition testimony, Ely stated that the road job was posted after he refused it, and that it was subsequently bid for by other Hall employees. App. 55a–56a. This would seem to imply that the job was open for some period after it had been refused initially by Ely, and might lead to the inference that Ely could have accepted the job after the notice of recall had been clarified by Collins' letter and conversation. At the oral argument of this appeal however, it was represented to the court that the job had been filled immediately after it had been first refused by Ely, and that he did not have a later opportunity to accept the position. To the extent that this is a disputed factual issue, it should be resolved by the district court on remand.

**68**

fore us, we would be most reluctant to hold that Hall could, in compliance with its collective bargaining agreement, issue a notice of recall by inquiring as to an employee's "interest in a road bid" and then break seniority because the employee had failed to respond to such an ambiguous notice. As we have indicated, an employee must be given an opportunity to respond to the recall notice after the employee understands that it is in fact a recall notice which is being given.

### IV

We hold, therefore, that summary judgment was inappropriately granted in this case because the factual issues that we have described remain disputed or undetermined. Accordingly, the judgment will be vacated and the case will be remanded to the district court for further proceedings not inconsistent herewith.